Merritt *v.* Earle.

The plaintiffs in this action were not the original creditors by whom the goods were sold, and it was suggested that less particularity was required from them than would be from the persons to whom the debt was originally due.

There is no distinction made in the statute, and there is no good reason shown for making any such distinction.

The statement is to be made by the debtor and not the creditor, and he can as well state the particulars in one case as in the other. He knows the particular transaction out of which the indebtedness arose, and he can state it as easily after the claim has been transferred to a third person, as he could before the transfer.

The motion to set aside the judgment as to the creditor making this motion must be granted.

[At CHAMBERS, August 22, 1859. *Ingraham*, Justice.]

---

## MERRITT *vs.* EARLE.

Judicial proceedings, on Sunday, are void, at common law; but all other business transactions on that day are valid, unless prohibited by statute. *Per* EMOTT, J.

A contract for work and labor, to be void, under our statute relative to the observance of Sunday, must be expressly and altogether for an act which the law forbids. It must be a contract for servile labor to be performed on Sunday exclusively and expressly, and not on any other day.

A contract for the transportation of property, upon a steamboat, is not void because made on Sunday; nor because the voyage is to commence, and does commence, on Sunday evening.

In an action against a carrier, for a breach of his duty as such, although negligence be averred, in the complaint, it is not necessary to show any positive misconduct, to sustain the averment.

Any act or omission of the carrier, or any thing which may befall his vessel and occasion danger to property, is regarded by the law as negligence, unless it be the act of God or the public enemies.

To sustain an action against a carrier for an omission to deliver property, it is sufficient that the property was received by the defendant's servants, on his vessel, for transportation, and that while he was engaged in transporting the same the property was lost, and not safely delivered.

Merritt *v.* Earle.

Upon these facts the carrier is liable, without any contract, and independent of any, unless the loss of the vessel was occasioned by the act of God.

Where the act of God is relied upon to excuse the carrier, it must be not only the sole, but the immediate, and not a remote cause of the loss.

A loss occasioned by an obstruction in a river, produced by mixed causes, and which is not the result of the operation of natural forces upon natural objects alone, as the shores or the bottom, is not, in a logical or a legal sense, the act of God.

Thus where a steamboat, carrying property for hire, was wrecked in the Hudson, by running upon the mast of a sunken vessel which had been capsized and sunk by a violent storm, a day or two before; it was *held* that the owner of the steamboat was liable for property lost by the sinking of the steamer.

APPEAL from a judgment entered at a special term after a trial at the circuit.

*Mr. Cardoza*, for the appellant.

*Robert H. Coles*, for the respondent.

*By the Court*, EMOTT, J. This is an action against a common carrier. The complaint alleges that the defendant, on the first day of September, 1856, being then a common carrier between New York and Albany, by means of the steamboat Knickerbocker running on the Hudson river, undertook and agreed to transport two horses of the plaintiff from Albany to New York, and received them on board of his vessel. That the defendant did not safely transport the horses to New York, but on the passage down the steamboat was sunk by the negligence of those in charge of her, and the horses were lost. The answer denies the receipt or possession of the property by the defendant, and denies all negligence; averring that the loss of the vessel was occasioned by the act of God. The cause was tried before me at the Westchester circuit, when I directed a verdict for the plaintiff, reserving the defendant's exceptions to be heard in the first instance at general term; intending to fix the amount of the recovery, if the plaintiff was entitled to one, and to present to the court the questions involved, for more careful consideration. The par-

ties have, for some reason, disregarded these directions; the plaintiff has entered judgment, and the defendant has appealed; but the legal questions involved are presented in the same manner as if the case were heard on the exceptions merely.

Upon consideration we think the plaintiff is entitled to recover. The case presents two questions. The first objection made by the defendant to the plaintiff's action was, that the contract for the transportation of this property was made and the property delivered on Sunday, and the voyage of the vessel was to be, and was, commenced on that day. The defendant was the owner of the steamboat Knickerbocker, which was at that time running regularly between New York and Albany; leaving New York for Albany on Monday, Wednesday and Friday in the afternoon, and Albany for New York on Tuesday, Thursday and Sunday in the afternoon, and arriving at her port of destination, each way, on the following morning. The plaintiff arrived in Albany with his horses, by rail road from the west, on the morning of Sunday, August 31; and having ascertained that the defendant's steamboat was to leave in the evening at six or seven o'clock, he put his horses on board in the afternoon, as he was directed to do by those in charge of the vessel, and took passage himself, when the vessel left. In the evening, while on the passage, he paid the freight of the horses at the office, on the boat, and took a receipt. While the boat was passing through the Highlands she ran upon the mast of a sunken sloop and was lost. This took place about two or three o'clock on Monday morning the first of September.

There are, it seems to us, a number of sufficient reasons why these transactions on Sunday do not constitute any objection to the liability of the defendant as a carrier. It must be remembered that all prohibitions of ordinary business on Sunday, with us, come from the statute. At the common law judicial proceedings, only, were prohibited on Sunday, which is said in the books to be *dies non juridicus.* Even this is not strictly on grounds of morality or of the

Merritt *v.* Earle.

Christian religion as recognized by the common law, nor was it the original practice of the Christian church. It was introduced, like very many other doctrines and practices, some of which are perhaps less commendable, into popular christianity and thence into common law and usage, by the influence of the clergy. It is well known to lawyers, at least, that until the year 500 the christian courts were open, and legal business transacted in the ordinary way on Sundays as on other days. In the year 517 a canon was made forbidding this practice; which canon was subsequently confirmed by an imperial constitution. It was received with other parts of the canon law by the Saxon kings of England, and afterwards ratified by William the Conqueror and Henry the 2d. Thus it comes that judicial proceedings on Sunday are void at common law. (*See* 3 *Burr.* 1597; 8 *Cowen,* 27; *Spelman's Orig. of Ten. ch.* 3, *p.* 75.) But all other business transactions are valid, except so far as prohibited by statute, however unbecoming or wrong in morals they may be considered. Our present statute (1 *R. S.* 675, 676) forbids traveling, except in specified cases, servile laboring or working, and the exposure to sale of any wares or merchandise, except certain articles of food at a particular hour of the day. These are unlawful acts by statute, and it may be conceded that a contract for doing them, or based upon them, would be void. Making a contract or agreement upon a Sunday, however, is not forbidden. Thus in *Boynton* v. *Page,* (13 *Wend.* 425,) a sale of a horse made on Sunday was upheld, and, in the opinion of Judge Sutherland, a number of cases are cited in which transactions on Sunday have been sanctioned.

If the liability of the defendant rested entirely on contract, he could not escape from it merely because the contract was made on Sunday. The contract was completed by the payment of the money and taking the defendant's receipt on the passage down. It was not however a contract for the performance of servile labor on Sunday, even if the business of the defendant is to be considered as coming within this term as

used in the statute.   It was simply an agreement for the trans-
portation of the plaintiff's horses ; and the defendant, if he
had chosen to do so, might have detained his boat until mid-
night on Sunday before starting on his voyage, and yet have
performed this agreement or any agreement under which the
property was received on the vessel.   It is true the vessel was
advertised to leave on Sunday afternoon, but it is also true
that the voyage would and could not be performed before
Monday.   If her departure on Sunday evening absolved her
owners from all liability as carriers, the same principle would
discharge the owners of vessels where voyages were completed
on Sunday, leaving the port of departure on Saturday and ar-
riving at their destination on Sunday morning.   It would also
be fatal to the responsibility of the owners of coasting and
lake steamers and canal boats, and of the numerous sailing
vessels on all our waters whose voyages regularly include a
Sunday between their commencement and their conclusion.
A rule which would lead to such results cannot easily be ad-
mitted.   The true rule is that a contract, to be void by this
law, must be expressly and altogether for an act which the law
forbids : it must be a contract for servile labor to be performed
on the Sunday exclusively and expressly, and not on any other
day.   Thus in *Watts* v. *Van Ness*, (1 *Hill*, 76,) the plaintiff
had been allowed to recover a specific sum beyond his com-
pensation for services on week days, for work as an office
clerk, done on Sundays.   The court set aside the report unless
the amount of these charges were deducted.   *Smith* v. *Wil-
cox* (25 *Barb*. 341) was an action for the price of an adver-
tisement published in a Sunday paper, which, as the court
say, is an article of merchandise distributed and sold only on
Sunday.   I apprehend that it would not be an objection to a
recovery by the printer of a daily paper, for his paper or ad-
vertising in it, that he saw fit or was accustomed or even was
compelled, in order to accomplish his publication properly, to
do part of his printing or other work on Sunday.

But the liability of the defendant does not rest upon con-

Merritt *v.* Earle.

tract, but upon his duty as a carrier, as settled and fixed by custom and the common law. It is true the complaint states an undertaking and agreement, but it is one which the law imposes, without any express contract, and whose responsibilities are only diminished, and never increased, when a formal contract is made. So, too, in this complaint negligence is averred, but it is not necessary to show any positive misconduct to sustain such an averment. Any act or omission of the carrier, or any thing which may befall his vessel and occasion danger to property, is regarded by the law as negligence, unless it be the act of God or the public enemies. In *Allen* v. *Sewall* (2 *Wend.* 338) it was held, after full consideration, that the gravamen of an action against a carrier may be a breach of duty; that no undertaking need be relied upon, and the action is in character *ex delicto.* It was sufficient, therefore, to sustain this action, that the plaintiff's horses were received by the defendant's servants on his vessel, for transportation; that the defendant was thus transporting them to New York on Monday morning, September 1st, and that they were then lost and not safely delivered. Upon these facts the defendant is liable, without any contract and independent of it, as it did not vary the terms of his legal liability; unless the loss of the vessel was occasioned by the act of God.

The defendant's counsel requested the court to charge the jury that the fact that the loss was occasioned by an inevitable accident, against which the defendant could not have guarded by the exercise of due diligence and precaution, discharged the defendant. The instruction was properly refused, for it assumed that the defendant's servants were guilty of no negligence—a question which was at least open to doubt, and upon which the plaintiff was entitled to go to the jury if the case was to turn upon it. But as a verdict was directed for the plaintiff, without leaving any question to the jury, the defendant's exception to that direction will raise the question which he desires to present. Notwithstanding the language of some judges and writers of high authority, I think there is a dis-

tinction between " the act of God" and " inevitable accident."
The reason and ground of the severe rule which the law holds
as to common carriers, is not to compel the exercise of due dil-
igence and caution, nor is that the measure of his responsibil-
ity. On the contrary there are risks, as was observed by Lord
Mansfield, which no foresight of the carrier could avert, and
losses which are not the consequence of any want of care or
skill on his part, but which nevertheless he must make good.
The law, for reasons of public policy, makes the carrier an in-
surer against all losses except such as are directly produced by
divine interposition, or attacks by public foes. The rule is
admitted to be severe, and to some extent arbitrary, but it has
always been vindicated as founded in wisdom. See the obser-
vations of Lord Holt in *Coggs* v. *Bernard*, (2 *Ld. Raym.*
909,) and in *Lane* v. *Cotton*, (1 *id* 546;) of Ch. J. Best in
*Riley* v. *Horne*, (5 *Bing.* 217,) and of Judge Bronson in *Hol-
lister* v. *Nowlen*, (19 *Wend.* 241.) The rule of a carrier's lia-
bility appears hard in other applications than to accidental
losses or destruction. As Lord Holt observes in *Lane* v. *Cot-
ton*, it seems hard that a poor carrier who is robbed on the
road, without any manner of default in him, should be answer-
able for all the goods he takes. Yet it would be more intole-
rable if it were not so, for the danger and the temptation to
combination and collusion with thieves and dishonest men.
So in respect to losses by what might be called accidents and
perils of the voyage, it must be observed that the carrier is in-
trusted absolutely with the goods he transports, and that very
often, and it may be said generally, in the absence of their
owner and of all human witnesses except himself or his ser-
vants. He therefore is held to insure them against every thing
but two things, which, as Ch. J. Best remarks, it is supposed
will be so well known to all the country where they happen
that no person would be so rash as to attempt to prove that
they had happened when they had not, viz. the act of God,
and the public enemies. There is a phrase sometimes used in
speaking of the liability of carriers, which is borrowed from

the express exception commonly inserted in bills of lading—I mean the phrase, "perils of the sea." But I apprehend it would not be safe to hold that this expression is synonymous with the act of God, or even with inevitable accident. Thus in *Smith* v. *Scott*, (4 *Taunt.* 126,) the term perils of the sea was held to apply to a case where the vessel was lost by being run down by another vessel, through the negligent management of the latter. The question has never perhaps been expressly determined in this state or in England, although a number of cases will be found collected and discussed in *Angell on Carriers*, § 166 *et seq.* and in *Story on Bailments*, § 512. The phrase would seem to import a danger resulting from the voyage, or the character of the transportation, and which the carrier could not have provided against by the exercise of all due care. The phrase "inevitable accident" goes a step farther, and applies to occurrences which no foresight or precaution of the carrier could prevent. But even this is not identical in meaning with the " act of God." That is an expression which excludes all human agency. It signifies the direct act of a providential cause ; for in a wider sense every thing is the act of God, since nothing happens but by his permission. In the case of the *Trent Proprietors* v. *Hood,* (4 *Doug.* 287,) Lord Mansfield laid down the distinction very expressly. That was a case of a loss by a vessel running on the anchor of another vessel which had no buoy to indicate its position. There was indeed an ingredient of negligence in the case, since they should have looked for the anchor, seeing the vessel. But Lord Mansfield observes, and the case is valuable for this, " The general principle is clear. The act of God is natural necessity, as winds and storms which arise from natural causes, and is distinct from inevitable accident." In *Forward* v. *Pittard*, (1 *T. R.* 27,) the same judge defined the " act of God" to be something in opposition to the act of man ; and added that the law presumes against the carrier, unless he shows it was done by such act as could not happen by the intervention of man, as storms, lightning and tempest. That was a strong case to

excuse the carrier. He was a wagoner, and had received on a Thursday a quantity of hops to be transported to Andover. His day of going was Saturday, and before that time, and during the day on Friday, a fire broke out in a booth 100 yards distant from the booth where the defendant had deposited the hops, and burning violently, consumed the booth where the hops were, and the hops. All negligence in the defendant was negatived by the case made. Yet the plaintiff had judgment, although it was an accident which the carrier could not have foreseen nor prevented. It might strictly be called an inevitable accident, and indeed the court say that the fire arose from the act of some man, " and therefore the carrier was liable, inasmuch as he is liable for inevitable accident." These distinctions are clearly indicated and approved in Judge Cowen's opinion in the leading case of *McArthur* v. *Sears*, (21 *Wend.* 198,) and indeed what I have been saying is little more than a reiteration of that opinion.

That was as strong a case for the defendant as the present, and in some points resembling it. The vessel was lost in attempting to enter the port of Erie. The master knew that his course should range by the lights of two lighthouses. It was a dark night, snow falling, and a considerable wind. One of the beacons was not burning, through some neglect, and a light on board a steamer which had grounded in a previous gale of wind was easily mistaken for the beacon. This mistake occasioned the loss of the vessel, certainly without any fault of the mariner. And it may be added that the vessel whose lights deceived the master had been previously cast away by a violent gale, which might properly have been called the " act of God." In that respect the case resembles this, because here the sloop whose mast entered the steamer's bottom was sunk in a squall of wind, although not perhaps without fault in her crew. But it was held in *McArthur* v. *Sears* that there was too much admixture of human means to sustain the defense, under the rules of law. Another leading case which the present circumstances still more nearly resem-

Merritt *v.* Earle.

ble, is *Smith* v. *Shepherd,* reported in *Abbott on Shipping, part* 3, *ch.* 4, § 1. There the defendant's vessel was lost by striking a floating mast attached to a vessel which had been sunk by getting on a bank which had been suddenly and unexpectedly made dangerous by a great flood. The changing of the bank was conceded to be an act of God; but that alone was not the cause of the loss of the vessel of the present defendant. There must be added the sinking of the other vessel and the fastening the mast, and this brings in human agency. Judge Parsons defines the "act of God," as spoken of in the law of carriers, to be something which operates without any aid or interference from man; and the learned American editor of *Smith's Leading Cases,* in his note to the case of *Coggs* v. *Bernard,* holds the act of God to mean the extraordinary violence of nature. It is a corollary from these principles and the cases in which they are found, that if the act of God is to excuse the carrier, it must be not only the sole but the immediate and not a remote cause of the loss. This is strongly exemplified in the case of *Smith* v. *Shepherd,* to which I have just referred. The defendant's vessel was forced upon the bank by the mast attached to the sunken ship. That ship had sunk in consequence of the alteration of the bank by a sudden flood, and the defendant's ship was wrecked for the same reason. The bank, in the condition in which it was before the flood, was safe for vessels to ground and lie upon. But it had become so steep and shelving that, upon the tide falling, the vessel's stern went off into deep water and she filled. There was no question of negligence, for evidence that the defendant used all possible care was offered at the trial and rejected. The flood by which the bank was changed was the ultimate occasion of the calamity, but it was held to be too remote. The defendant's vessel was not driven on the bank by natural violence, or without the interference of human agency. She came in contact with a floating spar which human agency had attached to the sunken vessel, and that was the immediate cause of her loss.

In the case at bar, it appears that on Friday before this occurrence, a sudden and violent squall overtook a number of vessels in this part of the Highlands, and one of the number not being able or ready to shorten sail with sufficient alacrity, was capsized and sunk. The defendant's steamer ran upon the mast of this sunken vessel, which stove in her bottom, and she was cast away in consequence. The immediate cause, therefore, of the loss of the defendant's vessel, was her running upon this mast. She was not forced upon it by the wind or current; and although the wind which was the occasion of the sinking of the sloop was a natural force, and operated upon the sloop without any intervention of human means, yet that was but the remote cause of the steamer's loss. To produce this there must have been added the placing the sloop in the position in which she was overtaken by the wind. The wind was the act of God; but that did not sink and would not have sunk the steamer. The sailing the sloop over that particular part of the river was the act of man, and without that, the defendant's steamboat would have sustained no harm. It was necessary that both these conditions should concur to cause the loss of the defendant's vessel. A loss occasioned by an obstruction in a river thus produced by mixed causes, and which is not the result of the operation of natural forces upon natural objects alone, as the shores or the bottom, is not, in a logical or a legal sense, the act of God. It may be inevitable by human care and skill, but it is not the consequence of agencies which are and were controlled by divine will and power alone.

We are of opinion that the defendant is liable, upon the settled rule of the responsibility of carriers, and therefore the judgment from which he has appealed must be affirmed.

[KINGS GENERAL TERM, December 12, 1859. *Lott, Emott* and *Brown,* Justices.]