## WESTERN DISTRICT, PITTSBURG, 1862.

# Hays et al. *versus* Kennedy et al.

1. When carriers provide that they shall not be liable for unavoidable dangers of the navigation, they mean dangers that are unavoidable by them, supposing that they have exercised all the precaution, care, and skill that the law usually demands of common carriers.

2. When carriers prove that an accident fell upon them without any previous fault of theirs, and that they had a proper vessel and crew, and did all in their power to extricate themselves, they shall be as free from liability as from fault.

3. A loss by collision without fault on the part of the carrier boat is covered by the exception in the bill of lading of "*unavoidable dangers of the river navigation*," and the carrier is not liable, even though the collision was caused by the negligence of those navigating the other vessel.

4. A carrier is bound to carry safely, and if he fail to do so, the burden of proof of a valid excuse is cast upon him.

ERROR to the District Court of *Alleghany County.*

The plaintiffs had shipped on the steamboat "Nat. Holmes," of which the defendants were owners, from Wheeling, Virginia, to St. Louis, Missouri, two carriages, which the defendants by their bill of lading, contracted to deliver safely and in good order, "*the unavoidable dangers of the river navigation and fire excepted.*" While descending the Ohio River, then at high water, near Aurora, Indiana, the "Nat. Holmes," being in the proper place, having given the usual signals, and using all possible means to avoid the collision, was run into by the steamboat "David Gibson," ascending the river, and was immediately sunk, and the carriages in question thereby lost.

[Hays et al. *v.* Kennedy et al.]

The "David Gibson" also sank before reaching the shore.

On the trial of the case the jury found that the loss occurred under such circumstances that no ordinary care, skill, or diligence on the part of those navigating the "Nat. Holmes" could have prevented the collision, but that there was negligence on the part of those navigating the "David Gibson," which led to the accident. The jury found for the plaintiffs in the sum of $489 15, subject to the opinion of the court upon the question of law reserved, to wit: Whether under the said recited exception in the bill of lading, and upon the above recited facts, the plaintiffs are entitled to recover.

After argument *in banc*, the court, WILLIAMS, J., entered judgment for the defendants upon the reserved question *non obstante veredicto*, and the plaintiffs sued out this writ of error.

*Hamilton* and *Acheson*, for plaintiffs in error.

The court below ruled the reserved question against the plaintiffs mainly on the authority of the cases of *Buller* v. *Fisher*, 3 Esp. 67, Peake's Add. Cases, 183, and *Whitesides* v. *Thurthill*, 12 S. & M. 590.

*Buller* v. *Fisher* is not in favor of defendants. The bill of lading excepted "perils of the sea," but it appeared that *neither of the colliding vessels was in fault*, and Lord Kenyon then held that the carrier under the exception in the bill of lading was "exempt from misfortunes happening during the voyage *which human prudence could not guard against—against accidents happening without fault in either party*." Every fair inference from the charge of Lord Kenyon is against the defendants. As to the decision in 12 Smeades & Marshall, the court may have fallen into the same error as the court below, in regard to the ruling in *Buller* v. *Fisher*.

In our case the goods of the plaintiffs while in the custody of the defendants were lost by means of the negligence of third parties, to wit: those navigating the David Gibson. The court below conceding that upon their common law liability as carriers the defendants were liable, ruled in their favor on their exception in the bill of lading. Now it appears from the authorities that the words "perils of the sea," and the unavoidable dangers of the river navigation," are equivalent phrases. *Gordon* v. *Little*, 8 S. & R. 562. Chancellor Kent, 3 Com. 216, defines "perils of the sea" to be "*the natural accidents peculiar to that element, which do not happen by the intervention of man, nor are to be prevented by human prudence.*" The only exception to this definition is a capture by pirates, and this perhaps because it is to be considered a loss by public enemies.

In ruling that the exception in the bill of lading in this case qualified the common law liability of the carriers, the court

ran counter to the current of authorities. "Inevitable accident," and "act of God," are synonymous phrases when used in reference to a loss by a common carrier. *Fish* v. *Chapman*, 2 Kelly (Geo. R.) 349; *Neal* v. *Sanderson*, 2 Smeades & Marshall, 572; *Lawrence* v. *McGregor*, 1 Wright (Ohio R.) 193; *Morrison* v. *Davis*, 8 Harris, 171; *Gordon* v. *Little*, 8 S. & R. 562. The usual exception in the bill of lading of "the dangers of the sea" does not vary the liability of the ship owners as common carriers. *Crosby* v. *Fitch*, 12 Conn. 410. To the same effect see *Williams* v. *Grant*, 1 Conn. 487. "An exception in a bill of lading of unavoidable dangers and accidents of the road," has been held to be no restriction of the carrier. 5 Blackford (Ind. R.) 222. "Perils of the sea" and "act of God" are synonymous. *Thomas* v. *Ship Morning Glory*, 13 Louisa. R. 269.

In *Backhouse* v. *Snead*, 1 Murph. N. C. R. 173, Taylor, J. says: "All accidents which can occur by the intervention of man, however irresistible they may be, the carrier is considered as insuring against." Angell on Carriers, 198. In the case of *Lawrence* v. *McGregor*, 1 Wright (Ohio), the circumstances of the collision were similar to the present case. The court then said: "If the loss resulted from the negligence or wanton acts of the navigators of the Lady Franklin, it did not result from inevitable accident." "In such case the defendants are responsible to the plaintiffs, and have their remedy against the Lady Franklin." To the same effect is *Blythe* v. *Marsh*, 1 McCord, S. C. 360. In that case there was a bill of lading, it was held that the collision was the result of the negligence of one or both the boats, and that in either case the carrier was liable to the shipper; see Angell on Carriers, sec. 166, No. 2. In the case of *Trent Nav. Co.* v. *Wood*, 4 Doug. 287 (26 Eng. Com. Law Rep. 358), the carrier was held liable for damage occasioned by running against an anchor which had negligently been left by another vessel without a buoy.

In Pennsylvania the courts have shown no disposition to depart from the strict but wise rule imposing on the carrier extraordinary responsibility. *Atwood* v. *Reliance Trans. Co.*, 9 Watts, 88; *Harrington* v. *McShane*, 2 Watts, 446; *Eagle* v. *White*, 4 Wharton, 576; *Hand* v. *Bayne*, 4 Wharton, 204. The case of the defendants is not one of special hardship. They have their remedy over against the owners of the David Gibson.

The decision of the court below is in contravention of public policy. Collisions on our rivers are always the result of carelessness or negligence in the navigators on one or both boats. But the officers and crew of the respective boats never fail to acquit *themselves* of blame, and it is difficult for third parties to decide

where the fault is. The innocent shipper should not be involved in these disputes.

*Thos. Ewing*, for defendants in error.

The ordinary responsibility of a common carrier is admitted to be that of an insurer against everything but the "Act of God and public enemies." In many of the States, as New York, Ohio, Indiana, and Connecticut, it was at one time held that this liability could not be limited by either notice or contract.

But the rule *now* well established by the English 'courts, the Supreme Court of the United States, and perhaps by the highest courts of every State is, *that the carrier may limit his responsibility by express notice or contract, leaving him responsible only for the soundness and adequacy of his means of transportation, and the conduct of himself and servants.* *Verner* v. *Sweitzer*, 8 Casey, 208. Parsons on Contracts, vol. 1, p. 703 and note. Another rule well established is, that it devolves on the carrier to show *affirmatively all the facts necessary* to bring him within the exceptions in his contract. *Verner* v. *Sweitzer, supra.* *Whitesides* v. *Russell*, 8 W. &. S. 44. These well-established rules and facts will serve to explain many of the cases cited for plaintiffs.

The argument of the learned counsel for plaintiffs may be reduced to these propositions, to wit: The exception in this bill of lading is only equivalent to the phrase "perils of the sea"— both these only mean "inevitable accident," and "inevitable accident" is equivalent to "act of God," or, in other words, that the exception in the bill of lading means nothing, and does not in any way limit the liability of the carrier. And numerous authorities are cited in support of these positions.

*Lawrence* v. *McGregor*, 1 Wright (Ohio), *Morrison* v. *Davis*, 8 Harris, and most of the cases cited are discussions of the common law liability of the carrier, and in such cases the words "inevitable or unavoidable accident" and "act of God" may properly be used as convertible terms.

"*Act of God*" *is always* "*inevitable accident,*" *but* "*unavoidable accident*" *is not always the* "*act of God.*"

The latter term appears to have acquired (as to common carriers) a limited and technical meaning, and is different from "perils of the sea" or "inevitable accident."

Lord Mansfield says: "Act of God is natural necessity, and is distinct from inevitable accident." *Forward* v. *Pittard*, 1 Term Rep. "The act of God is not equivalent to inevitable accident; there is a real difference between them." Parsons on Contracts, vol. 1, p. 635, note. *Schooner Reeside*, 2 Sumner, 371.

[Hays et al. *v.* Kennedy et al.]

Inevitable or unavoidable accident is defined to be that which a *party charged with an offence* could not possibly prevent by the exercise of ordinary care, caution, and maritime skill. Leavitt, J., in *Lucas* v. *The Thomas Swan*, 3 Am. L. Reg. vol. 3, p. 664. From the earliest times these (bills of lading) have exempted vessels not only on account of the "act of God," or of the public enemy, but from "perils by sea"—a broad and comprehensive phrase, covering most casualties not attributable to negligence of some kind in the officers or crew. *Trans. Co.* v. *Moore*, Am. L. Reg. vol. 6, p. 19 (Sup. Court of Mich.). But the learned counsel argue that "perils of sea" will not include accident occurring by human agency. Yet a loss by pirates is an admitted exception, *not* because they are public enemies, but because it is a peril of the sea, and no case is reported where it has been held an excuse when there was not such an exception in the bill of lading. The case of *Backhouse* v. *Snead*, 1 Murph., is cited as a case where there was a bill of lading with the usual exception; but the *loss there arose from a defective rudder, which was internally rotten.* The carrier cannot release himself from his warranty of the soundness of his vessel. In the cases of *Lawrence* v. *McGregor*, 1 Wright (Ohio), and *Trent Nav. Co.* v. *Wood*, 26 Eng. Common Law Rep., there was no bill of lading—it was the ordinary liability of the carrier— and in the latter case all the judges agreed that both vessels had been guilty of negligence. The case of *Blythe* v. *Marsh*, 1 McCord, as reported, does not in decision cover this case, whatever the *dictum* may be. It appears that the accident was the result of the carelessness or negligence of one or *both* vessels; now it was undoubtedly *essential* that the "Non Such" should prove positively that there was no negligence on her part, and a full report of the case would probably show that there was a failure of the proof that the vessel seeking to avoid the liability was not in fault. In the case of *McArthur* v. *Sears*, 21 Wendell, 200, the whole subject is considered in an able and elaborate opinion, and the proper distinction drawn between the liability of the carrier at common law and under exceptions in bills of lading similar to the one under discussion, and the court says: "The expressions 'perils of the sea or dangers of the river,' will be found to allow, in several cases, human agency or other causes to excuse a loss." *The case of one boat run down by another without fault* on the part of the carrier boat is cited as an instance. So also in the case of the *Juniata Patton*, 1 Am. L. Reg. 262, U. S. D. C. for Wisconsin, MILLER, J., says: "But the exception in this bill of lading of 'the dangers of the navigation,' is to be understood in a broader sense than to denote natural accidents. It extends to events not attributable to natural causes. It is extended so as to *excuse the car-*

[Hays et al. *v.* Kennedy et al.]

rier from losses by collision of two ships where no blame is imputable to his ship." To the same effect is Story on Bailments, sec. 514; Abbott on Shipping, pp. 240, 388 ; Chitty on Carriers (Phila. ed.) p. 254; Flanders on Shipping, secs. 307 and 301; Arnold on Insurance, vol. 2, p. 804. In the case of *Smith* v. *Scott*, 4 Taunton, 126, the Helena was run down in daylight on a smooth sea, by the gross negligence of the other vessel. The court, MANSFIELD, J., held the loss to be by a "peril of the sea." The case of *Buller* v. *Fisher*, 8 Espinasse R. 67, does not support the case of defendants. The report of the case shows that there was proof that the carrier boat was not in fault, but there was no proof as to the other boat, and if it was necessary that neither boat should be in default, it was just as necessary to prove positively that there was no negligence on the part of the other boat, as that the carrier boat exercised due care. The case of *Whitesides* v. *Thurlkill*, 12 Smeades and Marshall, 590, is full and clear, and decides the point in this case.

The exception in this bill of lading was *intended* to *mean something*, to limit in some way the ordinary responsibility. The plain, ordinary meaning of the words used would apply to and cover the loss in question—no one doubts this. Then what good legal reason is there for giving the words a *technical* meaning different from their ordinary acceptation ? The weight of authority is clearly on the side of the defendants, even taking the exception in the bill of lading as only equivalent to "perils of the sea," or "dangers of the river." But this exception is broader than either of these phrases. On the Ohio and Mississippi rivers one of the most fruitful sources of danger which the experienced navigator has to encounter, is the want of care and want of skill, and the recklessness of his fellow navigators, to him as unavoidable dangers of the river navigation as the winds and lightning of heaven.

Exceptions are introduced from the interest of parties; it is their *contract*, and it has no relation to public policy.

After argument a majority of the court, in an opinion by Mr. Chief Justice LOWRIE, delivered May 8th, 1862, and reported in 5th Wright's Reports, on page 379, affirmed the judgment of the District Court.

The opinion of WILLIAMS, J., of the District Court, is reported at length in Pittsburg Legal Journal, August 12, 1861, vol. 9, number 5.

From this decision Mr. Justice THOMPSON dissented, holding the doctrine to be

1. That among the "unavoidable dangers of the river navigation" are not included losses resulting from wilful or negligent human agency on the part of either of two colliding vessels.

[Hays et al. *v.* Kennedy et al.

2. That if either of two colliding vessels be negligent, the consequent injury is not by a peril of the sea.

Dissenting opinion by

THOMPSON, J.—The plaintiffs below shipped on board the steamer "Nat. Holmes," from Wheeling, Va., to St. Louis, two carriages, which the owners of the boat contracted to deliver, as per bill of lading, in good order, "the unavoidable dangers of the river navigation, and fire, excepted." While descending the Ohio, the "Nat. Holmes" being in her proper place, having given the proper signals, and using all possible means to avoid a collision, was run into by the steamer "David Gibson," which was ascending the stream, and immediately sunk, and the carriages lost. The undisputed facts at the trial showed that there was no negligence on the part of the navigators of the "Nat. Holmes," but that "there was negligence on the part of those navigating the 'David Gibson,' which led to the collision." The jury found a verdict for the plaintiffs for the carriages, viz., $489 15, subject to the opinion of the court on a point reserved, "whether under the said recited exception in the bill of lading, and upon the above recited facts, the plaintiffs are entitled to recover." After argument the court below entered judgment for the defendants on the reserved point *non obstante veredicto*, and the question now is, whether the judgment was rightly entered or not.

Common carriers, by land and at sea, are at common law alike exempt from all damage arising from what the law denominates the act of God and public enemies. Within this expression it seems to be settled that nothing is embraced which does not arise from an act of nature or natural causes, both direct and violent. Losses, to be within the protection of the principle, must therefore ensue from physical agencies, which are at the same time both violent and irresistible—such as storms, sudden squalls, inundations, marine volcanoes, lightnings, and the like, and not merely from their effects, such as changes in currents, raising of shoals and bars, &c. So, as the cause of the disaster must be direct and violent, a merely inactive cause, such as a thick fog, is not considered in law, although undoubtedly, theologically speaking, it is an act of God. The doctrines and principles on this branch of law are well stated in 1 Smith Lead. Ca. 5th Am. Ed. 317, note to *Coggs* v. *Bernard*, and seem, as therein stated, to have been always held by the courts in England. *Smith* v. *Shepherd*, in Abbott on Ship. part 3, div. 4, sec. 1 ; *Forward* v. *Pittard*, 1 Term, 27, and are now well settled by American authorities. Thus in *Friend* v. *Wood*, 6 Grat. 189, it was held that the stranding of a boat on a bar recently formed in the channel of a river, of which the navigator had no knowledge, was not a loss by

the "act of God," as it was also held, in *Merritt* v. *Earle*, 31 Barb. 47, that a loss was not, which was occasioned by an obstruction in a river, produced by running on the mast of a sunken vessel which had been sunk under circumstances that the navigators of the steamer could know nothing of its locacation. In this case, the court say a loss occasioned by an obstruction in a river produced by mixed causes, and which is not the result of natural *forces* upon *natural objects alone*, as the shores or bottom, is not in a logical or legal sense the act of God. "By the act of God," say the court in *Ferguson* v. *Brent*, 12 Mar'ld, 51, quoting Lord Mansfield, in *Forward* v. *Pittard*, 1 Term, 27, "is meant a natural necessity which could not have been occasioned by the act of man, but proceeds from physical causes alone, such as the violence of the winds or seas, lightnings or other natural accidents." The same in substance is the doctrine of the cases generally. *Coosa Riv. Steamb. Nav. Co.* v. *Barclay*, 3d M. 124; *Steele* v. *McTyre*, 31 Md. 677; *Jones et al.* v. *Pitcher*, 3 Stew. and Port. 135.

But there are many risks at sea which do not come within the act of God, as thus defined. Near Newfoundland a ship is sometimes for days, and even weeks, upon the banks in impenetrable fogs, where the eye cannot penetrate a boat's length. Indeed, this is the greatest peril of the sea to which our great steamers and packets to and from Europe are exposed. On the western coast of South America navigators inform us that channels have been changed in a day, by sub-marine volcanic action, and a vessel which followed a chart made a month before with accuracy, might be lost because she did so. In some bays, and estuaries, rapidly rising and falling tides will cause deposits upon which a vessel would be almost sure to be wrecked, but against which no human foresight could guard. Yet none of these are within the legal definitions of the act of God.

But is the navigator liable for losses on such account nevertheless? Of late times undoubtedly not. He may be saved by an allowable exception in his contract the bill of lading, against the perils of the sea or of the river navigation. Under this term, as already shown, there are many perils not within the meaning of the phrase act of God. They are peculiar to water navigation, arising from natural causes, sometimes direct and sometimes proximate, but always such as no human care or diligence can avert. Our great rivers, such as the Ohio, Mississippi, and Missouri, being subject to sudden and enormous rises, are beset by perils to the navigator analogous to the perils of the sea. Known channels are subject to be changed—fogs often obscure the way, and snags are fixed so easily and quickly in places to which they were strangers before, that no

experience or sagacity can guard against them. A rock long known in one place may be removed by floods, with ice or timber mingled, and deposited in another, and these are amongst the perils of river navigation. In *Gordon* v. *Buchanan*, 5 Yerg. 52, after defining the expression the act of God to mean what we have stated it, the court say that many disasters which would not come within this exception would yet fall within the exception " the dangers of the river which are unavoidable," such, for instance, as losses occasioned by *hidden obstructions in the river newly placed there*, and of a character that human skill and foresight could not have discovered and avoided. See also *Turner* v. *Thlea*, 7 Yerg. 340. So, in *Williams* v. *Brannon*, 1 Murph. (N. C.) 417, it was held that " dangers of the river " signify the natural accidents incident to the navigation. In *Gordon* v. *Lytle*, 8 S. & R., Mr. Justice Duncan says, " By the ' act of God ' is understood that loss occasioned by some act beyond the control and power of man to prevent," which he afterwards explains to mean " some action of the elements, something more than human acts—tempests, sudden gusts of wind, lightning, &c.," and then adds, " In the western waters dangers are of another kind. Sudden and great rises of water, shoals recently formed, and changes of the channel often occurring." Such perils as these, and others of a like kind, not coming within the common law exception in favor of common carriers, may be guarded against by an exception in the bill of lading.

Does a collision, as in the case before us, arising from the negligence on the part of one of the boats, although not that of the defendants, come within the exception " perils of the sea," or its analogous " dangers of the river navigation," under these views of the meaning of the exception in bills of lading? No doubt a collision which happens without fault on either side does. It is a peril of the sea or river in that case, for it is occasioned directly by the sea or river, and nothing else. The proposition includes the idea that man has done all he ought to have done or could do to prevent the collision, and of course it is an accident attributable to natural causes, although it may not be violent and resistless so as to bring it within the exception, the act of God. In a dark night, or in a place of irregular currents, such as "Hurl-Gate," a collision may occur in spite of every precaution on both sides. In such case in the absence of negligence, nobody is to blame, and neither vessel is liable to the other, at all events in the common law courts.

But is there no difference between this kind of case and others where the catastrophe results from negligence or wilfulness on one side, though not the party sought to be made liable? We answer, there is. Take the case before us. The

loss was caused, says the special verdict, by the negligence of a
boat coming up the river to the defendant's going down. The
exception in the defendant's undertaking was " the unavoidable
dangers of the river navigation, and fire, excepted." Was the
peril which produced the loss here within these words? Taking
the words in their philological meaning, it was not unavoidable;
and without restriction, as here, must mean unavoidable gene-
rally—unavoidable by any one, by all—inevitable as it respects
the agency of man. Now the loss here stands confessed as not
unavoidable by all, but as resulting "from the negligence on
the part of those navigating the ' David Gibson.' "

And this is the meaning settled by judicial authority, we
think. *Buller* v. *Fisher*, 3 Esp. 67, better reported in Peake's
Ad. Cases, 183, is oftenest cited, and often for what it does not
decide. It was a suit against a carrier where the vessel had
been lost by a collision. Peake, in his statement of the case,
says that the ships running foul of each other " *was a mere acci-
dent*," and that it was " impossible to *attribute blame to the mas-
ter of either vessel.*" Lord Kenyon, according to Peake, said in
his charge to the jury, " It appears to have been an *accident*
which *no prudence or skill* in navigation could *have avoided;*
such as any person navigating was liable to, and therefore he
thought the owners were not liable." Espinasse does not pre-
sent the facts in his statement so clearly as Peake as to neither
vessel being in fault, yet he plainly gives this as the ground of
his lordship's charge, in reporting him as saying, " They (the
carriers) are exempt by the condition of the charter-party from
misfortunes during the voyage which human prudence could
not guard against—*against accidents happening without fault of
either party*. I am of opinion that *neither* ship could be deemed
in fault, and that the misfortune must be taken to be a peril of
the sea."

*Marsh* v. *Blight*, 1 McCord (S. C.) 361, like that of *Buller* v.
*Fisher*, grew out of a collision. The immediate cause of the
loss was negligence on the part of the navigators of a vessel
called the " Planter's Friend." The vessel sued was the " Non
Such." In the opinion of the court it is said, " By the law of
England, if the loss appear to have been unavoidable, without
fault of *any one*, the owner of the ship or cargo must bear the
loss ; but when resulting from the want of diligence or skill IN
EITHER, it makes the common carrier liable. If the captain of
the vessel which causes the injury be in fault, he is *answerable
to the owners of the injured vessel, and they to the person for whom
they carry.* And upon examination it will be found that the
cases so strongly relied on, on the part of the defendant, sup-
port this doctrine."

So in accordance with this principle it was said in *Backhouse*

v. *Sneed*, 1 Murph. (N. C.) 193, that "all accidents which can occur by the intervention of human means, however unavoidable they may be, the carrier is considered as insuring against." In that case the loss occurred through a defective rudder, being internally rotten and not discoverable. It was placed, however, among the perils of navigation, because it was not discoverable by inspection, and there was nothing to lead to a supposition that it was rotten; as hidden defects in railway machinery which no reasonable exertion or exercise of care could detect and guard against, have been held to excuse the carrier. *Inyalls* v. *Bells*, 9th Met. 1.

Much looseness of expression by courts, as well as reporters and compilers, certainly exists on this subject; but we think that Chancellor Kent sums up the best authorities when he says the perils of the sea, and, by analogy, the "unavoidable dangers of river navigation," "are natural accidents peculiar to that element, which do not happen by the intervention of man."

In Pennsylvania we have shown no disposition to depart from the policy of the law on the subject of carriers; although the point now before us has never directly arisen and been determined, yet the life of the principle is to be found in several cases. In *Eagle* v. *White*, 6 Wh. 505, Rogers, J., remarked that a "common carrier is answerable for all losses which do not fall within the excepted cases of the act of God, or inevitable accident without the *intervention of man*, and public enemies." Admitting the doctrine to be one of extraordinary responsibility, he adds, "But it has stood the test of experience, and which we are unwilling to see frittered away any further than has been done in cases where carriers have been, as I think, unwisely permitted to limit their own responsibility." To the same general effect may be cited *Atwood* v. *Reliance Trans. Co.*, 9 W. 87; *Choteaux* v. *Leech*, 6 Harr. 224.

The only case opposed to these authorities, that we know of, is *Whitesides* v. *Thurlkill*, 12 Smeades & Marsh. (Miss.) 570. Being thus in conflict with them, it deserves some notice. It was a case of a common carrier by water, and he was discharged from liability to the shipper, the loss having occurred by a collision owing to the negligence of the navigators of another boat, the defendant being without blame. It was, therefore, a case just like the present. The court, in their decision, admit it to be in apparent contrariety with a former decision of the same court; *Gilmore* v. *Carman*, 1 Sm. & Mar. 279, to which, indeed, it does seem to stand more than opposed to much which had been therein said. The last decision, however, seems to have been rested on the faith of a passage in Story on Bail. § 512, which is cited by the learned judge delivering the opinion, thus: "The

term perils of the sea has been held to include losses by
the collision of two ships, where no blame is imputable to·
the injured ship." What Story does say is this, " The *precise*
import of the phrase (perils of the sea) is not *perhaps very
exactly settled*," and adds that it has been held to include "losses
by collision of two ships, where no blame is imputable to
either, *or at all events* where none is imputable to the injured
ship."

What he meant by this obscure sentence was undoubtedly
that a loss by collision was within the exception when no blame
is imputable to either vessel, and *even* where none is imputed
to the injuring vessel, although there may have been to the one
injuring it.

The only authority cited by Judge STORY for his statement
of the law thus laid down, are *Smith* v. *Scott*, 4 Taunt. 146, and
*Buller* v. *Fisher*, 3d Esp. already referred to. The former was
a suit, not against a common carrier, but on a policy of insur-
ance, where many risks are covered, under a general clause in
the policy, in advancement of the security afforded by the po-
licy, that would not necessarily be held to be so as against a com-
mon carrier. See Bateman's Com. L. § 1071, as to this clause
in policies. I do not think, therefore, this authority of much
weight in the scale on this question. The other case cited is
*Buller* v. *Fisher*, and, as we have already shown by the report
of it in Peake's Ad. Cases, 183, proves the opposite of the po-
sition for which it was cited ; namely, that if the injured party
be innocent of blame, the other, or injuring party not being so,
it is a loss by the perils of the sea. Abbott (Lord TENTERDEN)
on Ship. 7 Am. Ed. 506, cites the case for its true worth, viz :
that a loss by collision is a peril of the sea ONLY when no
blame is imputable to any one. So also does Ang. on Car. §§
780, 782.

In the editions of Story on Bailments printed since, 12 Sm.
& Mar., containing *Whitesides* v. *Thurlkill*, we notice that case
is cited in support of the passage on which *Whitesides* v. *Thurl-
kill* itself seems to have been ruled. Thus is the mutuality of
good offices between the principle, and the case quite apparent,
but which proves the other right is not quite so apparent. It
may be said, however, to be pretty certain that the principle
stated by Mr. Story was from an erroneous source, and it is
quite safe to suppose that authority resting upon it is also er-
roneous. I think, therefore, that the case from 12 Sm. &
Mar. is not an authority against the principle of the cases cited
by me. The learned author of the work on Bailments was pro-
bably misled by the loose statement of the case of *Buller* v.
*Fisher* by Espinasse, as he makes no reference to the report of
the same case by Peake.

[Hays et al. *v.* Kennedy et al.]

In *Small* v. *Naine*, 13 Q. B. 840, Lord Denman characterizes Espinasse's reports as unreliable and inaccurate. Such had been the opinion expressed by an accurate writer of our country, 16 Am. Jur. 274. On the other hand, his lordship bears testimony to the accuracy of Peake. See " The Reporters," by J. W. Wallace, Esq., 2d Ed. 331, a work which in passing we may say is very valuable, and has received high commendation in Westminster Hall, 5th Scott Rep. 854, per Sir E. V. WILLIAMS, J., in C. B.

The case of *McArthur* v. *Sears*, 21 Wend. 200, cited by defendants, although it discusses largely the doctrines of the courts upon the liability of common carriers, at common law, and also upon exceptions in bills of lading, yet it determines nothing of value as authority, in this sort of case, for in that there was no exception of the kind in the bill of lading, and the carrier was held on his common law responsibility, yet even the *dicta* therein contained do not militate against the doctrine of *Buller* v. *Fisher*, and other cases herein cited.

Chitty on Carriers, p. 171, was also cited by the defendants for the equivalent of the doctrine in Story, and the author cites for its support *Muddle* v. *Stride*, 9 C. & P. 380. But the case referred to has nothing whatever of the principle for which it was cited in it, and has no reference to it.

So in Flanders on Ship, 35, 307, 309, cited for the defendant's principle. It is so stated by that author, but in the same section in which it is so stated more than a doubt of its accuracy is expressed.

From this review of the authorities, we deduce the principle, that among the " unavoidable dangers of the river navigation" are not included losses resulting from wilful or negligent human agency on the part of either of two colliding vessels. If either be negligent, the consequent injury is not by a peril of the sea. The *rationale* of the doctrine may be found in a provident reluctance to relaxing the responsibility of common carriers beyond what the terms of the exception introduced for their benefit clearly import.

No more fruitful source of injury to bailors and shippers could be devised than to permit the carrier to set up and prove, as he would be sure to do, in case of loss or injury to goods carried, that the loss resulted, not from the mismanagement of his vessel, but from that of the injuring vessel. Convert this into a peril of navigation, and in collisions no one would be likely to recover much, be the loss ever so grievous, for the injuring vessel would be made the scape-goat, which if ever caught would only return the compliment by proving the carrier vessel to have been itself in fault. Experience will soon convince the most charitable judge of human nature that it is

[Adam Zubler *v.* Jesse S. Schrack.]

not an easy thing to prove a loss, from negligence, by the very agents in the negligence themselves. I have seen it tried, but never saw it accomplished. Quite a different undertaking would it be to prove that both vessels were blameless, and when that should be done, no one ought to be responsible. But when it cannot be done, in cases of collision, then let the rule be that the carrier vessel shall be responsible to the bailor, and seek its redress against the vessel causing the injury. Immediate resort to the aggressor would be sure to follow injury. The nearest judicatory would be appealed to, and the evidence necessary to establish the claim taken before it would be lost sight of. But turn the shipper of goods on the tributaries of the Ohio, for instance, to pursue the injuring craft whose owners as well as the scene of the disaster may be on the lower Mississippi, the hopelessness of obtaining testimony, if he did discover the owners, would entitle the undertaking to procure indemnity, to be classed almost with indications of insanity. Carriers are insurers to every extent not saved by the law or their contract, and it is often much more convenient to rely upon their responsibility than to seek insurance by a policy; but, whether or not, people do trust to them, and should be protected as far as possible, by holding the carrier to the necessity of proving clearly, in case of loss, that it resulted either from an act of Providence or the public enemy, or was within the clear meaning of the stipulated exception. Vast amounts of property are constantly passing over our great lines of commercial intercourse by railways and steamers, and the damage to commerce itself would be incalculable were we not to hold the agents of such an intercourse to a strict accountability.

I am of opinion that the judgment in the court below should be reversed, and judgment be entered for the plaintiffs.