# Reid *v*. The State.

## *Indictment for Libel.*

1. *Libel, indictment for; what sufficient.*—Under the provisions of the Revised Code, an indictment which charges that the defendant "unlawfully, falsely and maliciously published of and concerning" a specified third person, certain "false, defamatory and libelous matter," in writing (which is set out) "with the intent to defame" such person, concluding against the peace, &c., is a good indictment for libel.

2. *Sunday; when verdict of jury may be lawfully received on.*—When a jury, to whom a cause has been committed on Saturday or other secular week day, are lawfully kept together, under the charge of the officers of the court, and are ready on Sunday to deliver in their verdict, it is lawful for the judge to meet them, with the other officers of the court, to receive it, and thereupon to discharge the jury and adjourn the court until the next day. This is not making Sunday *dies juridicus* within the meaning of the common law.

3. *Imprisonment; when court may add.*—Under the provisions of the Revised Code, the court may add imprisonment for the term prescribed by law on conviction for libel on verdict of guilty, imposing a fine merely. The discretion to imprison not being expressly given to the jury, must, under section 3783 of the Revised Code, be exercised by the court.

APPEAL from City Court of Eufaula.

Tried before Hon. ALPHEUS BAKER.

The indictment in this case contained four counts; it is only necessary, however, to refer to one of them. That count "charged that the defendant unlawfully, falsely, and maliciously published of and concerning John C. Williams and Anna McDonald, the following false, defamatory and libelous matter in writing, with the intent to defame said John

[Reid v. The State.]

C. Williams and Anna McDonald, to wit : [Here followed, *literatim et verbatim,* a letter addressed to A. V. Lee (whose name is signed to the indictment as solicitor), which in effect accused Williams of having gotten McDonald with child, and that the two afterwards procured an abortion, and concealed the child in a branch. It also contained a number of questions to be asked of certain witnesses, as to time, place, &c., to show the guilt of said McDonald and Williams]— against the peace and dignity of the State of Alabama."

The jury found the defendant guilty, and assessed a fine of five hundred dollars, and the court added six months' imprisonment in the county jail.

A motion on arrest of judgment, and for the discharge of the appellant, were made, on the ground that the verdict had been received on Sunday, and that thereupon the jury were illegally discharged from their deliberations, without the consent of the defendant. The evidence in relation to these matters is so fully set forth in the opinion, that it need not be here repeated.

J. D. ROQUEMORE, F. M. WOOD and WATTS & SONS, for appellant.—The indictment is bad. It does not show that the writing was published for the *purpose* of bringing the parties into contempt, &c. Roscoe's Crim. Evidence, 649– 50. The alleged libel having been written to aid in a judicial prosecution, the indictment should show that the matter was *irrelevant and without probable cause.* 38 Ala. 279. The verdict is void, because rendered on Sunday. *Nabors* v. *The State,* 6 Ala. 200 ; *Merrett* v. *Earle,* 31 Barb. 38 ; *Pulling* v. *The People,* 8 Barb. 384 ; *Story* v. *Elliott,* 8 Cowen, 270.

JOHN W. A. SANFORD, Att'y Gen., *contra.*

MANNING, J.—The Revised Code provides (§ 3553) : "Any person who publishes a libel of another person . . . . must be punished, on conviction, by fine and imprisonment in the county jail, or hard labor for the county ; the fine not to exceed, in any case, five hundred dollars, and the imprisonment or hard labor not to exceed six months."

By section 4132, it is enacted that : "In an indictment for a libel, it is not necessary to set forth any *intrinsic* [? extrinsic] facts for the purpose of showing the application to the libeled party of the defamatory matter on which the indictment is founded ; it is sufficient to state generally that the same was published concerning him ; and the fact that it was

[Reid *v.* The State.]

so published must be proved on the trial."

And by section 4112, it is enacted of an indictment: "It must state the facts constituting the offense, in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment."

No form of an indictment for a libel is contained in the Code; but the forms for other offences therein set forth, are so short, and so meagre of circumstances and details, as to show that the legislature meant, by its enactments concerning indictments, to require that they should be as brief as was consistent with their being easily understood and unambiguous. Hence, an indictment which alleges that the person accused "unlawfully, falsely and maliciously published of and concerning John C. Williams and Anna McDonald, the following false, defamatory and libellious matter in writing, with intent to defame said John C. Williams and Anna McDonald, to wit: [here reciting the supposed libel], and then ends with the conclusion, "against the peace and dignity of the State of Alabama," is a sufficient legal charge of the offense of libeling them, if the writing so set forth imports an imputation of such misconduct on their part as would, if believed to be true, bring them into hatred, ridicule and contempt.

The writing in this case plainly imports that the persons referred to in it and designated by the names John C. Williams and *Anner* McDonald, had been concerned in procuring an abortive birth of a child of the latter by the former, and its burial in the bed of a watercourse; and that persons mentioned in the writing, if interrogated as witnesses, according to the instructions therein, could give information tending to establish such an accusation. The communication was, therefore, of such a nature as that a charge of libeling the persons who were the objects of it, might well be founded thereupon.

Whether the communication was made to the State's attorney (the solicitor), and for the purpose only of having the laws faithfully enforced against offenders, or for the purpose of defaming the persons to whom it related, was a proper matter for consideration by the jury upon the evidence in the cause. The bill of exceptions shows that more than fifty witnesses were examined upon the trial; and we must infer that every question which it was proper for the jury to consider was raised, discussed and decided. None of the

[Reid v. The State.]

evidence is reported in the bill of exceptions; nor is any charge of the court to the jury therein set forth and excepted to, or in any manner complained of. The object of taking the bill of exceptions was to bring before this court only certain matters which occurred at the time of the retirement of the jury to deliberate on their verdict, and afterwards. The following are the substantial facts deducible from the record.

The final charge of the court to the jury was finished at twenty minutes before 12 o'clock Saturday night; and it being so near to Sunday morning, it was by defendant, who was present, consented in open court, through his counsel, that if the jury agreed upon their verdict after 12 o'clock, and during the Sunday following, they might seal it up, deliver it sealed to the clerk of the court, and separate to meet again on the following Monday morning when the court should be in session, and, the verdict be then opened and read. The court, however, was not adjourned over to that day. About 1 o'clock Sunday morning the jury reported that they had agreed on their verdict; and it was sealed up and delivered to the clerk, and they were permitted to disperse. But after this, defendant having come in, and the judge, jury, sheriff and counsel having reassembled, at the court house, about 3 o'clock Sunday morning, and it having been agreed by the counsel for defendant, in his presence, that the verdict might then be received and the jury discharged, the envelope was opened and the verdict read, whereupon, the judge informed the jury that they were discharged for the term, and ordered the court to be adjourned to the ensuing Monday morning. On the latter day, and being in session, and the defendant present, and the cause called, it was laid over until the next day, at the request of his counsel. And on the next day (Tuesday) the defendant, with his counsel, being present, the verdict of the jury was read in open court, in their presence, they also being then there, by request of the judge.

A motion was now made for a new trial upon allegations of the influence of public prejudice upon the jury, and of newly discovered evidence, but was denied. A further motion followed, made by another attorney, who, after the opening of the verdict on Sunday, had been engaged to represent defendant, his original counsel refusing to participate therein, for the discharge of defendant, "on the ground that the verdict was received on Sunday and that the jury was illegally, improperly and unauthorizedly discharged without the consent in open court of the defendant;"

[Reid v. The State.]

which motion being overruled, defendant excepted, and judgment was rendered against him. It is now here insisted that Sunday being *dies non juridicus*, everything that was done by the court on that day is null and void.

If the term of the city court had been limited to the week ending with that Saturday night, then when the judge determined that the hour of 12 at midnight had arrived, the jury would have been *ipso facto* discharged by the termination of the authority of the court, and nothing of its powers would have "remained . . . . but those necessary to declare that its functions had ceased, and to remand the prisoner." *Nabors* v. *State*, 6 Ala. 200; *Ned.* v. *State*, 7 Port. 187.

The judge alone has authority to determine when the hour arrives at which the term of the court expires. *Nabors* v. *State, supra.*

But when the term of the court extends beyond Saturday of one week into and during the next week, a jury to whom a cause has been committed, and who are deliberating on the verdict they shall render, are not dismissed of course by the intervention of Sunday. They may be, and in some cases must be, kept together as an organized body, in charge of the sheriff, until they agree upon and render their verdict, or are discharged in some other legally sufficient manner. The business of courts could not otherwise be transacted. In England "it has been held," says Blackstone (vol. 3, p. 376), "that if the jurors do not agree before the judges are about to leave the town, though they are not to be threatened or imprisoned, the judges are not bound to wait for them, but may carry them round the circuit, from town to town, in a cart." And inasmuch as it must, doubtless, often happen that before the end of such a progress one or more Sundays would intervene, this court referred, in *Nabors* v. *State, supra*, to this curious passage in English judicial administration of former times, as authority for the practice which obtains here and elsewhere, that while the term is continuing, a jury is not discharged by the advent of Sunday.

It is well settled, however, that Sunday is *dies non juridicus.* *Haynes* v. *Sledge*, 2 Port. 530 : *Nabors* v. *State, supra*; *Story* v. *Elliott*, 8 Cowen, 27; *Swann* v. *Broome*, 3 Burrow, 1595. In this latter case, the subject was very learnedly argued and investigated, the validity of proceedings for a common recovery being dependent on the solution of it by the court. And it was shown that anciently the courts of justice did sit on Sundays; that this was the custom especially among christians; but that certain ecclesiastical canons were afterwards made by which it was prohib-

[Reid *v.* The State.]

ited that "causes should be tried or pleas holden" on certain days of the year, including all Sundays; which canons were received and adopted by the Saxon kings of England, and afterwards "confirmed by William the Conqueror and Henry the Second, and so became part of the common law of England."

But to what extent do the prohibitions of the common law thus modified reach? In *Haynes* v. *Sledge, supra,* it was held that a writ, which appeared from the teste thereof to have been issued on Sunday, was void. Says Justice THORNTON, "the maxim of the common law—*Dies Dominicus non est juridicus*—as we learn from all the authorities which we consult for its principles, expressly embraced and avoided every original process obnoxious to this objection." The reason of this, as explained by Lord Mansfield, in *Swann* v. *Broome, supra,* p. 1600, was that in those days "the awarding of process and the giving of judgment were *judicial acts.*" See also to this same point, *Vanveckton* v. *Paddock,* 12 John, 181. But without this reason, the decision in *Haynes* v. *Sledge,* was correct; because by a statute of 1803, then in force, in this State, it was enacted : "No person, or persons, upon the first day of the week, called Sunday, shall serve or execute, or cause to be served or executed, any writ, process, warrant, order, judgment or decree (except in criminal cases or for a breach of the peace), but the service of every such writ, process, order, warrant, judgment or decree, shall be void to all intents and purposes whatsoever," &c.   (Clay's Dig. 593, § 3.)   And under a precisely similar act in New York, the supreme court of that State, in 1815, following an English decision, upon the similar statute of 29 Charles II, held that the policy which prohibited the service of the process, prevented also the issuing of it on Sunday. *Vanveckton* v. *Paddock, supra.*

But it seems that the Sunday prohibitions of the common law reached only the courts.   Its injunctions were all embraced in the maxim: *Dies Dominicus non est juridicus.*  The Lord's day is not a court day.   Judicial acts were held *void,* but not ministerial acts.   And no contracts or transactions of individuals entered into, or made on Sunday, were, on that account, void by the common law.   It is only by statute that they are made so.   *Merritt* v. *Earle,* 31 Barb. 40; *Strong* v. *Elliott,* 8 Cowen, 30 ; *King* v. *Int.* *Whitnash,* 7 B. & C. 596 ; *Flanagan* v. *Meyer,* 41 Ala. 138.

In MacKalley's case (in 9 Co. 66) cited by Lord Munsfield in *Swann* v. *Browne,* "it was objected that Sunday is not *dies juridicus,* and therefore no arrest can be made in it ; and ev-

ery one ought to abstain from secular affairs upon that day."
But it was answered and resolved: "That no judicial act
ought to be done on that day; but ministerial acts may be
lawfully executed in the Sunday." (3 Burrow, p. 1601.)
This was in 9th James I.

So in *Beclo* v. *Alpe,* on a proceeding for ingrossing butter
and cheese, contrary to statute, it was assigned for error—
"that the information was exhibited in court, on the 13th of
October, which in that year (20 James I) was a Sunday,
and therefore not *dies juridicus.*" But it was resolved,
"that it was good; for although it was not *dies juridicus* for
the award of any judicial process, or to *make an entry of any
judgment on record.* Yet it was good for accepting an infor-
mation upon a special law." (3 Burrow, 1599.) Both of these
cases were decided before the enactment of the Sunday stat-
ute of 29 Charles II, and tend to explain what the canon
law on the subject was.

The only law we have now relating to proceedings on
a Sunday, are the common law, and sections 2578 and 2941
of the Revised Code; the former of which sections author-
izes the issue and execution of bail process, and the latter
the issue and execution of writs of attachment, on Sunday,
if affidavit be made that the defendant is about to abscond
or to remove his property. Is there anything in these, or
in the common law, to prevent a court from simply meeting
and receiving on Sunday morning the verdict of a jury if
they be ready to render it, in a cause which has been sub-
mitted to them on Saturday before? Must the jury and
sheriff's officers attending them, be kept together twenty,
fifteen, or any number of hours longer, where perhaps they
have neither comfort, nor opportunities for religious exer-
cises, rather than that the judge shall meet them for a few
minutes in court, to have their verdict delivered, and to dis-
charge them? Could this have been held to be just or chris-
tian-like, when it was lawful to prevent juries from having
food, fires and other comforts, until their verdict was ren-
dered?

The Sunday laws must have a reasonable interpretation.
Discussing an act which authorized the service of process,
in certain cases, on Sunday, in respect to the legality of its
being issued on that day, THORNTON, J., said: "It would
seem to me that in those instances where, from the urgent
necessity of the case, service of process is authorized, its
issuance is, under the same circumstances, rendered a matter
of duty; and being provided for the prevention of fraud
and iniquity, could not shock the moral and religious sense

VOL. LIII.

of the community, as a general disregard of the Sabbath assuredly would." Thus, he concluded that the duty of service of process on Sunday being imposed by the statute on a sheriff, the corresponding duty of issuing the process on that day ·was impliedly imposed on the clerk, in the same circumstances. So, we are of opinion that when a jury, to whom a cause has been committed on a Saturday or other secular week day, are lawfully kept together under charge of officers of court, and are ready on Sunday to deliver in their verdict, it is lawful for the judge then to meet them with the other officers of court to receive it, and thereupon to discharge the jury, and to adjourn the court until the next day. This is not making Sunday *dies juridicus*, within the meaning of the common law.*

We are not without authority to support this conclusion. In the memorable trial at the Old Bailey, in London, in the time of Charles II, (reported at length in 6 State Trials, 951), of the celebrated William Penn and one Mead, for a tumultuous assembly, the cause was given to the jury on Saturday (the 3d of Sept., 1670), who on the same evening brought in a verdict with which the presiding magistrates, who were prejudiced against the prisoners, were very much dissatisfied. Whereupon, after much altercation, and with a declaration by one of the court to the jury that they should be locked up without meat, drink, fire or tobacco, the jury were directed again to retire, and "the court then adjourned to the next morning, which was Sunday, when the prisoners were brought to the bar and the jury sent for."

An abridgement of the report of what then followed is given by Forsyth in his "History of Trial by Jury" (p. 400 *et seq.*), as follows : *Clerk*—"What say you? Is William Penn guilty of the matter whereof he stands indicted, in manner and form aforesaid, or not guilty?" *Foreman*— "Guilty of speaking in Grace Church street?" *Recorder*— "What is this to the purpose? I say I will have a verdict;" and speaking to Bushel (one of the jurors), he said: "You are a factious fellow ; I will set a mark upon you ; and whilst I have anything to do in the city, I will have an eye upon

---

*Note.—A verdict is not equivalent to a judgment, or to the award of arbitrators. Speaking of awards, Yates, J., said in *Van Cortland* v. *Underhill* (15 John R. 416): "It certainly would be a dangerous innovation to put them on a footing with the verdict of a jury. They are and ought to be of a more binding force between the parties." And in *Strong* v. *Elliott, supra*, Savage, Ch. J., said : "Arbitrators are not jurors to *determine facts*, but *judges to adjudicate* as to the law." [By Judge Manning.]

[Reid *v*. The State.]

you." *Mayor* (to the jury)—" Have you no more wit than to follow such a pitiful fellow ? I will cut his nose." *Penn.* —"It is intolerable that the jury should be thus menaced. Is this according to the fundamental laws? Are not they my proper judges by the Groat Charter of England? What hope is there of ever having justice done when juries are threatened and their verdicts rejected ? I am concerned to speak, and grieved to see such arbitrary proceedings. . . . . Unhappy are those juries who are threatened to be fined and starved and ruined, if they give not in verdicts contrary to their consciences."

Much more of a like sort took place ; and twice on that same Sunday the court met this jury to receive their ver- dict, and refused to receive it, only because dissatisfied with it, and then adjourned to the next day, when a verdict of "not guilty" was rendered.

This trial took place at the "Old Bailey," before the en- actment of the Sunday statute of 29 Charles II. And how- ever much we may be shocked at some of its incidents, surely the practice of this famous criminal court of London, held by its highest magistrates, in the capital of the country which was the home of the common law, may be regarded as estab- lishing that the sitting of a court on Sunday to receive the verdict of a jury was not illegal according to that common law.

In New York, it was held, in 1818, that it was not im- proper for a court to receive the verdict of a jury on Sun- day, but was illegal then to enter judgment on it. *Hoghtolen* v. *Osborn*, 15 Johns Rep. 119 ; *Story* v. *Elliott, supra.*

In the revision afterwards of the statute law of New York, the rule of this decision was expressly incorporated in a clause adopted in the words following : "No court shall be open, or transact any business, on Sunday, unless it be for the purpose of receiving a verdict, or discharging a jury ; and every adjournment of a court on Saturday to another day shall always be to some other day than Sunday, except such adjournment as may be made after a cause has been committed to the jury. But this section shall not prevent the exercise of the jurisdiction of any single magistrate, when it shall be necessary, in criminal cases, to preserve the peace or to arrest offenders. *Pulling* v. *The People*, 8 Barb. 385.

This clause seems to us to express, with much precision, what was, indeed, the common law on the subject, without any" statute.

Section 3553 of the Revised Code makes a defendant, con-

victed of libel, punishable by fine not to exceed five hundred dollars and imprisonment in the county jail not to exceed six months; and according to section 3783 the imprisonment must be imposed by the court, unless the discretion is expressly conferred on the jury, which is not done in case of libel. The court was, therefore, authorized to add the imprisonment it imposed.

We find no error in the record and the judgment is affirmed.