## STEPHEN A. McKINNEY v. THE STATE.

1. PRACTICE — AMENDMENT. — The allowance of an amendment of an application for a continuance is a matter purely within the discretion of the trial court, and this court will not revise its action.

2. SAME. — This court will not revise the action of a lower court in overruling a second application for a continuance, excepting in cases exhibiting plain abuse of judicial discretion.

3. A CONTINUANCE entered and charged up against a party by his consent has the same effect, and entails upon him the same burdens, as though he had presented a written application to the court and obtained a continuance thereon.

4. SAME. — Either the State or a defendant may obtain a continuance or a postponement of the trial, when it is made to appear to the satisfaction of the court that, after the commencement of the trial, the applicant is so taken by surprise by some unexpected occurrence, which by reasonable diligence he could not have anticipated, that a fair trial cannot be had. An application of this character is not precluded by the previous overruling of an ordinary application.

5. SAME. — An irregularity committed in the court below in the formation of a petit jury will not be revised in this court when it appears that the defendant did not exhaust his peremptory challenges.

6. EVIDENCE. — When the *scienter* or *quo animo* is a constituent of an offence, and necessary to be proved, it is competent to introduce testimony of acts, conduct, or declarations of the accused which tend to establish the knowledge or intent, though they in themselves constitute in law distinct crimes, and are apparently collateral and foreign to the main issue, and may have occurred either prior or subsequent to the act for which the accused is being tried.

7. SAME. — On trials for murder, former grudges, former quarrels, and antecedent menaces may always be shown, to prove motive and the prisoner's malice against the deceased.

8. SAME — PRACTICE. — In laying the predicate for the impeachment of a witness by inquiring of him as to contrary statements made by him, the proponent should state to the witness the time and place of the alleged contrary statement, and the person to whom it was made, giving his name. Proof to the effect that the identical statements were made to another individual of the same surname, but whose Christian name was different, will not be admitted in impeachment of the witness.

9. MALICE. — The ruling in *Harris* v. *The State, ante,* p. 90, on the legal signification of the term "malice," referred to with approval.

10. PRACTICE IN COURT OF APPEALS. — This court will not reverse a case because of a mere abstract charge given to the jury in the court below, on a question not in the case, when it does not appear that the rights of the accused could have been injured thereby.

11. MURDER. — To reduce an unlawful killing from murder to manslaughter, it is not sufficient that it was done under the immediate influence of sudden passion, rendering the mind incapable of cool reflection, but there must also have existed an adequate cause to produce such sudden passion.

12. VERDICT. — That it is competent for a court to receive a verdict on Sunday is no longer an open question in this State. See *Shearman* v. *The State,* 1 Texas Ct. App. 215.

13. JUDGMENT — PRACTICE. — Art. 720 of the Revised Code of Criminal Procedure is merely intended to authorize the entry of judgment as soon as practicable, without awaiting the filing of motions for new trial or in arrest of judgment.

14. CHARGE OF THE COURT. — It was not error to refuse to charge the jury upon a theory of defence not warranted by any evidence.

APPEAL from the District Court of Travis. Tried below before the Hon. E. B. TURNER.

The appellant, Stephen A. McKinney, and one Gentry Bailey were on the twenty-first day of November, A. D. 1878, jointly indicted by the grand jury of Travis County for the murder of Gus Porter.

Mrs. S. E. Porter (also called Mollie Seymour), mother of the deceased, and first witness for the State, testified to a difficulty in the alley-way in the rear of Katie Franklin's house, two nights before the killing, between the deceased and one Rosengreen. She stated that she went out there, where she found some four or five boys, among whom were the deceased and the defendant, and, she thought, Gentry

Bailey.  On inquiring what was the matter, the deceased replied that Rosengreen had invited him into the alley. Rosengreen said that Porter had gotten " up on his ear," and that he could take him down.  Porter replied that he had nothing but his hands to defend himself with, and did not know that he had a friend in the crowd.  One of the number then announced himself the friend of Porter.  The defendant, McKinney, remarked that he did not fight with his fists ; to which Porter replied, " No, I know you don't ; you always carry a pistol."  The above testimony was all objected to, and exceptions duly saved to its admission.

The parties here seem to have separated.  The deceased and some of the boys went into the house.  The house was owned by the witness, but was at that time kept by Katie Franklin. · Later the same night the witness returned to the house.  The accused also shortly thereafter returned to the house, and commenced cursing ; said he wanted to find some son of a bitch to shoot ; he was accompanied by some other person, who was a part of the time on the gallery. The witness told accused there was no one there but her to fight, and that she was a woman.  The accused replied that he did not want to fight her, and left the house.  The accused was in the parlor when he said he wanted to kill some son of a bitch.  The above testimony was objected to throughout, and exceptions duly saved to its admission. This all happened on Wednesday night.  Porter was shot the following Friday night.

On the night of the killing, witness saw accused and Gentry Bailey at the house kept by Katie Franklin but owned by witness.  Witness lived about one square off on the same street, but on the opposite side.  Witness went to Katie Franklin's house a little before the shooting ; found no one there but the inmates of the house.  Gentry Bailey and the defendant came there shortly after.  In a few minutes deceased entered the hall, and witness called him ; deceased went into Katie Franklin's room, remained a few minutes,

and then left through the front door.   Defendant and Bailey were both in Lottie Walton's room at the time deceased entered the house, as also at the time he went out.   Katie Franklin's room was the first on the right-hand side of the hall, as you enter; Lottie Walton's room was the second on the left.   A few minutes after Porter had left through the front door, defendant and Bailey left the house together through the back door; witness saw them on the back gallery, going towards the back gate.   Witness went back into the house, and shortly thereafter heard a pistol-shot in the direction of the alley; then two or three others.   In a few minutes she was informed that her son was shot.   On repairing to him she found him in a speechless condition. Later the same night, after medicine had been given him, he, the deceased, revived somewhat, and after expressing a consciousness of impending death, gave an account of the shooting, as follows: After deceased left the house of Katie Franklin, he and some companions who had been awaiting him at the gate went to an adjacent public square where some hobby-horses were, and finding that the hobby-horses were not then running, they turned back towards town to go home.   On passing the mouth of the alley in the rear of Katie Franklin's house, he heard Gentry Bailey's voice, and bade his friends wait for him a few minutes, as he wanted to see Bailey about a postal-card, and he turned into the alley.   He met McKinney, who " faced him up." McKinney ordered him twice to throw up his hands, and he (Porter) threw up one hand, and said, " Hold on, Steve; I want to see Bailey."   McKinney then ordered him to throw up both hands, but without giving him a chance to do so, fired, and shot him through the breast.   He fell to his knees, and as he rose he drew his pistol with his left hand and returned the fire.   When McKinney fired the first shot, Bailey mounted his horse and said, " Don't shoot me, Gus; I never did you any harm."   Bailey got on the inside of a picket-fence, after mounting his horse, and then shot back at Porter.

Katie Franklin, for the State, testified substantially the same as Mrs. Porter as to what happened·at her house on the night of the killing, excepting that she testified that the defendant and Gentry Bailey were at her house twice that evening, once early in the night, and the second time just before the killing. On direct examination, she testified that the first time they came in, McKinney, as he passed through the hall, said he would see if there were any officers in the house; if so, they would not tackle him, but would find him, Gus Porter, the son of a bitch, and kill him before day. On cross-examination, she said these remarks were made by McKinney the second time he came to the house.

Lottie Walton, a witness for the State, and an inmate of the house, testified that she saw defendant and Bailey at Katie Franklin's house between ten and eleven o'clock of the night of the killing. They asked if any officers were in the house, and she replied, " No." When they were in the act of leaving, through the back way, she walked towards the gate with them, and asked McKinney what made him so cross, when he jerked his hand away from her and said, " Stand back, you bitch, or I will give it to you in place of the one I am going to give it to." They started up the alley, and before witness got off of the back gallery she heard three pistol-shots. Before leaving the house, McKinney said to Bailey, " Come on, let's go get him."

Frank Campbell, witness for the State, testified : About ten or eleven o'clock on the night of the killing, witness and the deceased and others went to the house of Mollie Seymour (Mrs. Porter). Gus Porter went inside the house; the balance of them remained outside near the gate. Just before Porter went in, witness heard some one say, " There he is," or " There they are." In two or three minutes Porter came out, and they all started to the hobby-horses. On getting to the corner of the block, they saw that the horses had been closed up for the night, and they then started uptown again. On getting to the mouth of the alley, at its west end, Porter said, " There is Bailey now ; I want to see

him." Witness observed two horses tied in the alley.
Porter walked down in the alley, called Gentry Bailey by
name, and asked if he had called him (Porter) a son of a
bitch. Did not hear Bailey reply; heard McKinney say
"Throw up your hands." Porter threw up one hand;
McKinney then said, "Throw up your other hand, or, G—d
d—n you, I will kill you," and shot Porter as he said it.
Porter fell to his knees. Porter, while on his knees, drew his
pistol; it snapped the first time; two shots were then fired,—
one by McKinney and one by Porter. In the meantime Bailey
mounted his horse, rode around in the west lot, and then
fired a shot at Porter, and Porter returned the shot. Two
more shots were fired, — one by Bailey and one by Porter.
Porter then walked to the mouth of the alley and said,
"Boys, I am shot," and fell. Porter had advanced down
the alley about fifteen feet, — nearly but not quite to the
horses. Defendant and Porter were about fifteen feet apart.
Porter had nothing in his hand when he turned into the
alley.

On cross-examination, the witness testified that when the
remark was made at the gate, "There they are now," Por-
ter said, "Wait until I go into the house." Soon after he
came out, witness saw that he had a pistol. Porter re-
marked, "The boys are fixed for me." Two other wit-
nesses for the State testified substantially the same.

T. H. Osborne, a witness for the State, testified that he
was in the alley about three-quarters of an hour before the
shooting. At that time he saw McKinney hitching a horse
to the fence on the south side of the alley, and he heard
some one, addressing McKinney, say, "Be careful how you
hitch that horse." McKinney replied, "That is all right;
I have got a damn good knife." Witness knew Bailey,
and was satisfied that the voice he heard was his.

John Robinson, a witness for the State, testified that he
worked at the "Headquarters Saloon;" that Gus Porter
also worked there. After dark on the same night Porter

was shot, McKinney and Bailey came to the saloon ; Bailey looked in at the door and said, "·Where is Gus Porter?  He is not here, but d—n him, we will find him."   McKinney was then standing outside, on the sidewalk.

Charlie Thompson, witness for the State, testified to having seen defendant and Bailey in the alley in the rear of Katie Franklin's house a few minutes before the shooting. They examined their pistols and returned them to their pockets, and McKinney said, " If the son of a bitch is in the house, we will kill him."   They then entered Katie Franklin's house, and a few minutes thereafter witness heard the firing.

Susie Patterson, witness for the State, testified that on the night of the killing she saw accused and Bailey at the house of Blanche Dumont, before the killing.   Some of the girls importuned Bailey to treat ; whereupon he exhibited some money, and said, " I do not refuse to treat because I have not got the money ; but we will be back directly and I will treat to beer, if we don't get killed, or kill somebody and have to jump the country."   McKinney was sitting near by, but said nothing.   Blanche Dumont testified substantially the same.

For the defence, it was proved that appellant voluntarily surrendered himself two or three weeks after the shooting.

Sallie Daggett, a witness for the defence, testified that on the night of the shooting, Gus Porter came to her house and inquired for defendant and Bailey.   He said they had had a fuss, and that defendant and Bailey were talking about him, and that he would make them retract or kill them, or they kill him, — that he was fixed for them ; and he then exhibited a pistol, which witness got from him, but about five minutes afterwards returned to him, he saying he wanted it to protect himself.

Dr. Stalnaker, witness for the defence, testified that he attended on Gus Porter after he was shot, and heard him tell his mother that if he got well he would not blame the

parties who shot him ; that if he had minded her he would not have got into this trouble.  Blucher Hutchings, a witness for the defendant, testified substantially the same as Dr. Stalnaker.

It was proved by several witnesses that Porter was carrying arms for a night or two before the killing.  James Simms testified that a night or two before the killing he exchanged pistols with Porter, who then avowed an intention to see Rosengreen and Bailey, and if they owned up to what they had said about him he would knock them on the head, and if any one interfered he would give it to them. Witness on same evening saw Porter accost Rosengreen, Bailey, and the accused.  Porter asked Bailey if he had called him a son of a bitch ; Bailey replied " No."  He then accosted Rosengreen about their former quarrel in the alley, and during the altercation which ensued Porter called Rosengreen a liar, and struck him in the face.  McKinney then affirmed what Rosengreen had said, and Porter called them all three G—d d—n liars.  McKinney then told him if he wanted anything out of him, to come up town the next day and bring his pistol with him.  The parties then made friends and separated.

Henry Noll testified that Porter told him of this difficulty, and said that he struck Rosengreen to make McKinney or Bailey take it up.  Witness told Porter he had better let the boys alone, or somebody would get hurt.  Porter replied he would not get hurt ; somebody might get killed, but it would not be him.  Porter was then armed.

Willie Metz testified that he was present and heard the conversation between Noll and deceased ; that deceased said he had slapped Rosengreen in the mouth, and that he (Rosengreen) would not fight ; that McKinney and Bailey were there, and if any of the other sons of bitches had taken it up, there would have been somebody hurt.  Noll said, " You had better let them boys alone ; you will get the worst of it."  Porter laughed, and replied, " Yes, I will."

James Dunn testified that on the Saturday night before the killing, deceased was standing in the door of a saloon. McKinney had just left, and walked about half-way across the street, when deceased said he would kill that man on sight.

George Carpenter testified, for the defence, that on the ·night before the killing he saw Porter with a pistol, and asked him what he was going to do with it. Porter replied that he was going to kill a son of a bitch. Witness asked who it was, and deceased replied, " Buddy McKinney."

Jeff Randolph testified, for the defence, that he was with the deceased and others on the night of the killing, at the time they went down to the hobby-horses. When they got near the front gate of Mollie Seymour's house, he saw Bailey and McKinney in the house, and told Porter they were there. Porter went into the house, and returned in a few minutes, and said his mother would not let him see them in the house ; that they would go around to where the horses were hitched in the alley. They walked around to the mouth of the west end of the alley. Porter said, " Boys, I will be back in a minute." He (Porter) stopped at the mouth of the alley, about fifteen feet from the nearest horse, and did not move until he was shot. Witness stopped about ten feet north of the mouth of the alley. He heard voices which he recognized as the voices of Bailey and Mc-Kinney ; heard McKinney say, " Who is there? " Porter did not reply. McKinney then said, " Throw up your hands." Porter said, " Hold on." McKinney again said, " Throw up your hands." Porter said, " Hold on." Mc-Kinney then said, " Throw up your hands, God damn you, or I will kill you," and fired as he spoke. On cross-examination, witness testified that when McKinney said " Throw up your hands," Porter threw up one hand, that he could see. The balance of his testimony is substantially the same as the testimony of Frank Campbell.

The defence here closed ; and the State then introduced

testimony in rebuttal, but it is not deemed necessary to re-view it.

The above is but a brief summary of a vast volume of testimony, and is intended to present merely the most strik-ing portions of it.

The accused was convicted of murder in the second de-gree, and his punishment assessed at confinement in the penitentiary for the term of eleven years ; from which judg-ment of conviction this appeal is prosecuted.

During the trial of the cause, quite a number of excep-tions were taken by counsel for accused to the rulings of the court, but it is thought that they and the questions they present are sufficiently stated in the opinion of the court. A motion for a rehearing was made and overruled.

*Walton, Green & Hill* and *Ward & Pendexter*, for the appellant.

*Thomas Ball*, Assistant Attorney-General, for the State.

White, P. J.   On the presentation of defendant's appli-cation for continuance, it was ascertained from the docket that it was a second one, and as such was defective in omitting to state, as required by statute, "*first*, that the testimony cannot be procured from any other source known to defendant ;" and "*second*, that defendant has reason-able expectation of procuring the same at the next term of the court." Code Cr. Proc., art. 561. Defendant's coun-sel asked leave to withdraw it, that he might amend it in this regard, stating that he had forgotten or overlooked the fact that a previous continuance had by consent been granted as upon the application of and been charged to the defendant. It was and is also claimed that the former con-tinuance, being one of consent, and not a formal one under the statute regulating first continuances, is not subject to the strict rules governing written applications, and should

not have the same force and effect against the party charged therewith.

Under a provision of the Code, "a criminal action may be continued by consent of the parties thereto, in open court, at any time." Code Cr. Proc., art. 556. If, it may be done by consent, then no reason is perceived why terms also cannot be stipulated for; nor why, if it be agreed that it should be charged to one or the other party, the agreement should not have the same force and effect in its burdens and liabilities as if the party had voluntarily entailed them upon himself by means of a written application granted by the court. Such verbal agreements to continue, before the above provision was incorporated into the Code, were recognized and enforced in practice in this State, and so far as we are advised have uniformly, when entered into with leave of the court, been held to be binding. Where a party is known to have sufficient grounds, as a matter of favor to him the opposite party may waive the written application on condition that the one so obtaining the benefit is duly charged with it. The writing is all that is waived, the other burdens and liabilities under the law remaining the same.

As we understand the bill of exceptions, this was the attitude in which defendant found himself before the court when he requested to withdraw and amend his application. To all intents and purposes his application was a second one, and clearly defective. Being a second one, the granting of his request, and not only that, but even the granting of his continuance, had it been strictly formal, was a matter within the discretion of the court. The refusal to permit the amendment is not a matter subject to revision, and the refusal of a second continuance would only be revised in a case exhibiting the plainest abuse of judicial discretion.

One Charles Thompson was the witness to obtain whose testimony the continuance was mainly sought. Subpœnas had issued for this witness at the instance of defendant, and

had been served; but when the witness served made his
appearance, it was discovered that he was the State's wit-
ness Charles Thompson, and not Charles Thompson, the
defendant's witness, who had never been summoned, though
he also was a resident of Travis County.    Under these cir-
cumstances, defendant's application might have been based
upon another article of the Code, which provides that " a
continuance may be granted on the application of the State
or defendant, after the trial has commenced, when it is made
to appear to the satisfaction of the court that by some unex-
pected occurrence since the trial commenced, which no rea-
sonable diligence could have anticipated, the applicant is so
taken by surprise that a fair trial cannot be had; or the
trial may be postponed to a subsequent day of the term."
Code Cr. Proc., art. 568.    A motion under this provision
might, we apprehend, have been made after the application
for continuance was denied, because the cause was then, in
contemplation of law, on trial.    Code Cr. Proc., art. 604.
Further, the record shows that the trial lasted from the
13th to the 21st of November, before the case was sub-
mitted to the jury for verdict, and, for aught that appears,
there was ample time during the interval to have had
the witness summoned, being a resident of the county.
Had he been summoned and put in an appearance during
the progress of the trial, his evidence would doubtless have
been admitted at any time before the argument was con-
cluded.    Code Cr. Proc., art. 661.    Had he been sum-
moned and failed to appear, the additional diligence used
to procure his attendance might again have been urged, in
connection with the supposed materiality of his evidence,
on the motion for new trial.

As we have seen, however, the application was in fact a
second one, which did not comply with the legal requisites,
and the court did not err in overruling it.

We are unable to see that any injury was done defendant
with regard to summoning the special *venire*, as the matter

is exhibited in his second bill of exceptions. No complaint is made that the twenty jurors summoned were not duly qualified, nor that in summoning them the officer acted corruptly (*Castanedo* v. *The State*, 7 Texas Ct. App. 582); nor that an incompetent or otherwise objectionable juror was forced upon defendant. On the contrary, the judge's statement in connection with this bill shows that the jury was finally completed and defendant's peremptory challenges were not exhausted. The jury law intends that the regular jurors be made available, if practicable, without resort to talesmen. *West* v. *The State*, 7 Texas Ct. App. 150; *Lambertson* v. *The People*, 5 Park. Cr. 200. And where a defendant's peremptory challenges have not been exhausted in the formation of a jury, it has been held time and again that any irregularity or error in that respect will not be noticed or revised, because he had it in his own power to correct it as long as his challenges lasted. *Myers* v. *The State*, 7 Texas Ct. App. 641; *Grissom* v. *The State*, Galveston term, 1880, *ante*, p. 386.

Following the order and line of argument pursued in appellant's brief, the next error (shown by the seventh bill of exceptions) is the admission in evidence, over objections, of certain portions of the testimony of Mrs. Seymour, the mother of deceased, as to two transactions two nights prior to the killing. The first was a difficulty between deceased and other parties, one of whom was defendant; and the second was the conduct and declarations of defendant at a late hour of the same night, in witness's house, kept by Katie Franklin, at which time defendant said "he wanted to find some son of a bitch to shoot."

It is a rule of law which is well settled that "when the *scienter* or *quo animo* is requisite to and constitutes a necessary and essential part of the crime with which the person is charged, and proof of such guilty knowledge or malicious intention is indispensable to establish his guilt in regard to the transaction in question, testimony of such acts, conduct,

or declarations of the accused as tend to establish such knowledge or intent is competent, notwithstanding they may constitute in law a distinct crime." Whart. on Hom., sect. 701.

Mr. Greenleaf says : " In some cases, however, evidence has been received of facts which happened before or after the principal transaction, which had no direct or apparent connection with it ; and therefore their admission might seem at first view to constitute an exception to this rule [which excludes evidence of collateral facts]. But those will be found to have been cases in which the knowledge or intent of the party was a material fact on which the evidence, apparently collateral and foreign to the main subject, had a direct bearing, and was therefore admitted." 1 Greenl. on Ev., sect. 53. Upon a trial for murder, former grudges and evidence of former quarrels between the parties, and antecedent menaces, may always be shown to prove motive and the prisoner's malice against deceased. 2 Ph. on Ev. 169 ; Roscoe's Cr. Ev. 71 ; *McCoy* v. *The State*, 25 Texas, 33 ; *Carr* v. *The State*, 41 Texas, 543 ; *Dill* v. *The State*, 1 Texas Ct. App. 278. " There can be no question that the acts, the declarations, and the conduct generally of a party charged with the commission of an offence, both before and after its alleged commission, are competent to be proved upon the trial to establish any fact essential to be proved, if they tend legitimately to establish such fact, and they are competent to establish the existence of motive as any other fact. Motive is a minor or auxiliary fact, from which, when established, in connection with other necessary facts, the main or primary fact of guilt may be inferred ; and it may be established by circumstantial evidence, the same as any other fact. The proper inquiry is, does it fairly tend to raise an inference in favor of the existence of the fact to be proved. If it does, it is admissible, whether such fact be innocent or criminal in its character." 3 Park. Cr. 681 ; Whart. on Hom., sect. 598 ;

*Hudson* v. *The State*, 59 Ala. 333 ; *Pierson* v. *The People*, 18 Hun, 239 ; 1 Bishop's Cr. Proc., sect. 1065.

Mr. Bishop announces the correct doctrine to be, " that though the prisoner is not to be prejudiced in the eyes of the jury by the needless admission of testimony tending to prove another crime, yet, whenever the evidence which tends to prove the other crime tends also to prove this one, not merely by showing the prisoner to be a bad man, but by showing the particular bad intent to have existed in his mind at the time when he did the act complained of, it is admissible, and it is also admissible if it really tends thus (as in the facts of most cases it does not) to prove the act itself." 1 Bishop's Cr. Proc., sect. 1067.

Now, applying these rules of law to the facts of this case as connected with the evidence objected to.: Prior to the occurrences in the alley, narrated by the witness, it is but reasonable to assume that a falling out or difficulty of some sort had taken place between deceased and one if not all of the three parties, Rosengreen, Bailey, and McKinney. If the evidence is to be believed of the State's witnesses concerning subsequent circumstances, which intervened and finally culminated in the fatal *rencontre*, then we think it but equally reasonable to assume that, if not before, certainly at the time of the difficulty in the alley, an agreement or conspiracy had been entered into by the parties named, to whip or do some injury to the deceased. Why, if such was not the plan, are they found at the time and place engaged in an angry and threatening altercation with deceased, who was at his home, or, if not at home, at a place which was owned and seems to have been controlled by his mother, and where it appears he was accustomed to visit frequently and with perfect and unrestrained freedom?

If such a conspiracy really existed at the time mentioned, then there can be no question as to the legitimacy of that portion of the evidence, — the parties being all present and apparently acting in concert. At the time of the subsequent

occurrences in the house, on the same night, testified to, over defendant's objection, by the witness, it is true defendant was not accompanied by either of the other conspirators; but why is he at that particular time and place hunting, as he says, "some son of a bitch to shoot," if his object was not to find and shoot deceased? and whom, it seems, the parties had been designating in that manner. With whom else had he recently had a difficulty? We say, if the State's witnesses are to be believed, — and the jury must have believed them, and they do not appear to have been successfully contradicted in these matters, — then this inference of a conspiracy, connecting what had already transpired with the subsequent events, fairly coincides with and is further evidenced by his conduct and declarations on his second visit to the house that night. We see no error in the admission of this testimony. *Goaler* v. *The State*, 5 Baxt. 678.

The fifth and sixth bills of exceptions, taken to parts of the testimony of the witnesses Dumont and Patterson, come within the same category as the one just discussed. This evidence shows McKinney, Bailey, and Rosengreen together on the night of the shooting, about seven or eight o'clock, and when asked to treat, "Bailey said he would treat when he came back, if he did not kill some one or get killed, and have to jump the country." Connect this with the fatal difficulty but a few short hours after, and who can doubt, in the light of antecedent and subsequent events, the full significance of his remark?

After the witness Robinson had testified, defendant's counsel, with a view of impeaching and discrediting his testimony, on cross-examination asked him (fixing time and place) if he did not tell John Silva that Mrs. Porter, the mother of deceased, had promised to give him $75 to testify in the case. Other similar questions were asked him with reference to supposed statements made to John Silva, all of which were denied by the witness. When the defence

placed their impeaching witness, Silva, on the stand, it was, ascertained that his Christian name was Lawrence, and not, John, and the court refused to allow the witness to testify, as to the proposed matter. This ruling of the court is set, out and complained of in the eighth bill of exceptions.

" The credit of a witness may also be impeached," says, Mr. Greenleaf, " by proof that he has made statements out, of court contrary to what he has testified at the trial. But it is only as to such matters as are relevant to the trial. And before this can be done, it is generally held necessary, in the case of verbal statements, first to ask him as to time, place, and person involved in the supposed contradiction. It is not enough to ask him the general questions whether he has ever said so and so, nor whether he has always told the same story ; because it may frequently happen that, upon the general question, he may not. remember whether he has so said, whereas, when his attention is challenged, to particular circumstances and occasions, he may recollect and explain what he has formerly said. * * * And this rule is extended not only to contradictory statements by the witness, but to other declarations and acts done by him, through the medium of verbal communications or corre- spondence, which are offered with the view either to contra- dict his testimony in chief, or to prove him a corrupt witness himself, or to have been guilty of attempting to corrupt others." 1 Greenl. on Ev., sect. 462. But in any case where it is sought to lay the foundation for the im- peachment of a witness, the time and place of the alleged statement, and the person to whom it was made, should be given in the question. *The State* v. *Kinley*, 43 Iowa, 294 ; *Mathis* v. *The State*, 33 Ga. 24 ; *The State* v. *Patterson*, 2 Ired. L. 346 ; *Cole* v. *The State*, 6 Baxt. 239 ; Shaw's Tr. on Ev., side-p. 241, note *k; Williams* v. *The State*, 3 Texas Ct. App. 316 ; *Henderson* v. *The State*, 1 Texas Ct. App. 432 ; *Treadway* v. *The State*, 1 Texas Ct. App. 668. The name of the person to whom the statements were

made must be stated accurately in laying the predicate; and a predicate laid in the name of one individual will not and cannot be proven by showing that the identical statements were made to another individual of the same surname, whose Christian name is different. The witness sought to be impeached had his attention specially called to what he told one John Silva, and his answers were with reference to that individual alone. Had he been asked with reference to Lawrence Silva, they might have been different. The court did not err, under the circumstances, in excluding the proposed evidence of Lawrence Silva.

Quite a number of objections are urged to the charge of the court. The definition of the term "malice" is complained of, the language of the court being: "Malice, in it's legal sense, means the intentional doing of a wrongful act toward another, without legal justification or excuse." It is contended that the legal definition is, "that state of mind under which the killing of a person takes place without any cause which will in law justify, excuse, or extenuate the homicide." Citing *McCoy* v. *The State*, 25 Texas, 33, and *Tooney* v. *The State*, 5 Texas Ct. App. 188. A somewhat similar definition of malice, but not so full, was given in the case of *George Harris* v. *The State*, ante, p. 90, and it was said: "The definition contained in the charge, though not exact to a critical nicety, is deemed substantially sufficient to have enabled the jury to distinguish the legal meaning of the term, in contradistinction to its ordinary import."

That portion of the charge upon manslaughter which is complained of is a literal copy of the statute. Penal Code, art. 594, subd. 2. But it is said that there was no evidence to authorize such a charge, and that the facts proven deny it. The court copied the statute defining manslaughter (Penal Code, art. 593), and the statutory explanation of the expression, "under the immediate influence of sudden passion." Art. 594. As used, if the words or portion of the statute complained of were not in truth applicable to

the facts proven, it is not made to appear how defendant was injured, if at all, thereby; and we are of opinion that it was a mere harmless abstraction, not calculated in any manner to mislead or affect the finding of the jury.

That portion of the charge relating to a previous quarrel and reconciliation is also objected to, because, it is said, "there was no evidence of previous quarrel, and none of previous reconciliation." Defendant's witness Simms gives an account of a difficulty which took place a night or two before the killing, between deceased and Bailey, Rosengreen, and McKinney; after which, he says, "all the parties made friends, and they left Porter." The charge was one called for by this evidence, and sufficiently announced the rules of law applicable to the evidence. *McCoy* v. *The State*, 25 Texas, 43; *Murray* v. *The State*, 1 Texas Ct. App. 421. And consequently it was unnecessary to further elaborate the same principles, as they were again enunciated in defendant's third special instruction, which was refused.

The second special instruction, refused by the court, was in these words, viz.: "No killing which results from sudden passion, being either of the emotions of the mind known as anger, rage, sudden resentment, or terror, rendering it incapable of cool reflection, can be murder in the first or second degree, unless the slayer shall have provoked a contest with the deceased, with the apparent intention of killing or doing him serious bodily injury, or unless the person who was the aggressor did not make the aggression with the intent to bring on the conflict for the purpose of killing the person slain."

This proposition is very ingeniously framed, and counsel in the brief informs us that it was drawn with special reference to the statute (Penal Code, art. 603), which reads, that "though a homicide may take place under circumstances showing no deliberation, yet if the person guilty thereof provoked a contest with the apparent intention of killing or doing serious bodily injury to the deceased, the offence

does not come within the definition of manslaughter.''
Doubtless the instruction was designed to present the con-
verse of this statutory provision ; but it has failed to do so.
And the proposition stated in the special instruction is not
a correct proposition of law ; for a killing upon such sud-
den passion as is mentioned may be murder in the second
degree, even though the passion was anger, rage, sudden
resentment, or terror, rendering the mind incapable of cool
reflection.   To make such killing manslaughter, there must
actually have existed not only such state or emotion of the
mind, but the *adequate cause* which produced them must
also exist.   Penal Code, art. 602.   Insulting words or ges-
tures, or an assault and battery so slight as to show no
intention to inflict pain or injury, may be sufficient to cause
the emotions of the mind known as anger, rage, sudden
resentment, or terror, to the extent even of rendering it
incapable of cool reflection, and yet a killing under such
circumstances would not be manslaughter.   Why ?   Be-
cause such insulting words or gestures, or such assault and
battery, *are not adequate causes* (Penal Code, art. 596),
and manslaughter cannot be predicated upon any voluntary
homicide upon sudden passion not arising from *an adequate
cause*.   Penal Code, art. 593.   The instruction ignores
'' adequate cause,'' the essential element in manslaughter.
The same objection lies to the third special instruction,
which was also refused by the court.   We see no error in
their refusal.

As to whether the verdict of a jury may be returned and
received on Sunday, suffice it to say, the question is no longer
an open one in this State.   The case of *Shearman* v. *The
State*, 1 Texas Ct. App. 215, was decided by this court after
mature consideration, and the decision we still think is based
upon reason and authority.   See the authorities cited in
Shearman's case, and also *The Commonwealth* v. *Marrow*,
3 Brews. 402 ; *The State* v. *Ricketts*, 74 N. C. 187 ; 53 Ala.
402.   By the new provision of the Code, to the effect '' that

in every case of acquittal or conviction, the proper judgment shall be entered immediately '' (Code Cr. Proc., art. 720), it was simply intended to authorize the entry of judgment as soon as practicable, without waiting for defendant to file motions for new trial, or in arrest of judgment, as was theretofore required. Pasc. Dig., art. 3094. A judgment may, under certain circumstances, be entered even at a subsequent term. Code Cr. Proc., art. 797. We perceive no error in the action of the court with respect to the verdict and the manner of rendering judgment.

The only remaining question we propose to notice is the refusal of the court to give in charge to the jury defendant's fourth special instruction. The main theory of the defence was that the fatal shot was fired in self-defence, to prevent deceased from shooting, or doing serious bodily injury to Bailey or himself. Upon this point, amongst other charges, defendant requested the fourth, as follows : " If the jury believe from the evidence that, at the moment of the shooting, deceased had taken his position at or near the horses of defendant and Gentry Bailey, his companion, and there waited until defendant and Bailey approached their horses, and then made such movements as to induce defendant to believe, and that defendant did believe, that said deceased was then about to shoot defendant or Gentry Bailey, and that defendant only shot deceased to prevent deceased from shooting defendant or Gentry Bailey, or doing them, or either of them, some serious bodily injury, then the shooting was not unlawful, and you will acquit defendant." This charge was not warranted by any evidence in the case. It assumes to charge upon a state of facts which does not exist, to wit, that deceased had taken up a position at or near the horses, and was lying in wait to slay these parties. No such inference can legitimately be assumed from the facts. No witness testified that deceased took a position near the horses, and there waited the approach of the other parties. To have given the charge would have been to place a false coloring

upon the evidence, and been liable to mislead the jury by intimating and insinuating to them that in the opinion of the court there was evidence of a lying in wait on the part of the deceased. "The court might well refuse an insinuation that assumed, contrary to the truth, that the proof upon that point was doubtful, or which insinuated a doubt, and would have left the inference that the jury were at liberty to find contrary to the fact proved." *Harrison v. The State*, 15 Texas, 239.

The general charge as given to the jury might with propriety have been fuller upon the law of self-defence as applied to the facts, but it states the law concisely, and, we think, sufficiently clear to give the jury all the information necessary to a proper determination of the question. As a whole, no valid objection can be urged to the charge.

Several other supposed errors are argued with earnestness and ability in the brief of counsel, which we do not notice in this opinion, because we do not consider them of such moment or merit as to demand special attention. We believe we have discussed the prominent points in the case. We have most certainly given the entire record our calm and mature consideration. We have found nothing in it militating against the correctness and legality of all the proceedings of the trial resulting in the judgment we are asked to reverse. The case has been defended with marked ability; no right which the law gives has been overlooked or neglected to the detriment of the defendant. His punishment cannot be said to be harsh or excessive, in view of the mode, the manner, the certainty, and the magnitude of his crime. He has brought it upon himself, and should abide the consequences. Our duty will not allow us to stay the hand of the law, and the judgment is therefore in all things affirmed.

*Affirmed.*